[No. S155823. June 22, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE JESUS MEDINA et al., Defendants and Appellants.

## COUNSEL

Chris R. Redburn, under appointment by the Supreme Court; and Joy A. Maulitz for Defendant and Appellant Jose Jesus Medina.

John Steinberg, under appointment by Supreme Court, for Defendant and Appellant George J. Marron.

Mark D. Lenenberg, under appointment by Supreme Court, for Defendant and Appellant Raymond Vallejo.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson, Kristofer Jorstad, Joseph P. Lee and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

CHIN, J.—In this case, a verbal challenge by defendants (members of a street gang) resulted in a fistfight between defendants and the victim (a member of another street gang). After the fistfight ended, one of the defendants shot and killed the victim as he was driving away from the scene of the fight with his friend. The jury found the gunman guilty of murder and attempted murder of the friend, as the actual perpetrator, and two other participants in the fistfight guilty of those offenses as aiders and abettors. The Court of Appeal affirmed the gunman's convictions, but reversed the participants' convictions. It held there was insufficient evidence that the nontarget offenses of murder and attempted murder were a natural and probable consequence of the target offense of simple assault, which they had aided and abetted.

Because a rational trier of fact could have concluded that the shooting death of the victim was a reasonably foreseeable consequence of the assault, on the facts of this case, we reverse the judgment of the Court of Appeal relating to the nonshooting defendants.

## I. FACTS AND PROCEDURAL HISTORY

On the evening of January 2, 2004, Manuel Ordenes and his wife Amelia Rodriguez continued their New Year's celebration with a party at their home in Lake Los Angeles, California. Their neighbors Kirk and Abraham, a friend, Lisa, and Jason Falcon were present at their house. Jose Jesus Medina ("Tiny"), George Marron, and Raymond Vallejo, self-described members of the Lil Watts gang, were also present. Although Falcon was not identified as a gang member, he was always with Medina, Marron, and Vallejo. Ordenes had formerly been a member of the Lennox gang, a Lil Watts rival, although the two gangs were not rivals in the Lake Los Angeles area. Everyone was drinking alcohol and using methamphetamine.

Around 11:00 p.m., Ernie Barba drove to Ordenes's house with his friend, Krystal Varela, to pick up a compact disc. Barba went to the house, while Varela stayed at the car. When Ordenes or Rodriguez answered the door, Barba asked, "What's up?" On direct examination, Ordenes stated he heard aggressive voices inside the house saying, "Where are you from?" Later on cross-examination, he clarified that he heard Vallejo say, "Who is that?" and then ask Barba, "Where are you from?" From his experience as a former gang

member, Ordenes knew that when a gang member asks another gang member "where are you from?" he means "what gang are you from?" a question that constitutes an "aggression step." He also knew that, if the inquiring gang member was an enemy, the question could lead to a fight or even death. If that gang member had a weapon, he would use it. Wanting to avoid problems in his house, and concerned that somebody was going to get killed, Ordenes ordered, "Take that into the streets, go outside, don't disrespect the house."

Medina, Marron, Vallejo, and Falcon left the house and joined Barba on the front porch. Once outside, Medina, Marron, and Vallejo approached Barba and continued to ask, "Where are you from?" Barba replied, "Sanfer," signifying a San Fernando Valley gang. Vallejo responded, "Lil Watts." Medina remarked, "What fool, you think you crazy?" Vallejo then punched Barba. Medina and Marron joined in the fight. According to Ordenes, Barba, even though outnumbered, defended himself well and held his own against the three attackers. All three "couldn't get [Barba] down." Krystal Varela confirmed that Barba was defending himself well.

Ordenes attempted to break up the fight and pull the attackers off Barba, but Falcon held him back. Eventually, Ordenes was able to pull Barba away and escort him to his car, which was parked in front of the house. Barba got into the driver's seat, while Krystal Varela got into the passenger seat. At the car, Ordenes advised Barba to leave.

Varela heard someone in the yard say, "get the heat," which she understood to mean a "gun." Barba closed the driver's side door and drove off. As Ordenes was walking back to his house, he heard Lisa yell from the doorway, "Stop, Tiny. No, stop." Amelia Rodriguez then saw Medina walk into the middle of the street and shoot repeatedly at Barba's car as it drove away. Lisa, who was standing next to Rodriguez, yelled, "Tiny, you know you're stupid. Why you doing that? There's kids here. You f'd up." Barba died of a gunshot wound to the head.

The prosecution charged Medina, Marron, Vallejo, and Falcon with first degree murder (Pen. Code, § 187, subd. (a))[1] and with attempted willful, deliberate, premeditated murder (§§ 664, 187, subd. (a)). Under the prosecution's theory at trial, Medina was guilty as the actual perpetrator, while Marron, Vallejo, and Falcon were guilty as aiders and abettors.

---

[1] All statutory references are to the Penal Code.

At trial, Hawthorne Police Officer Christopher Port testified as the prosecution's gang expert. Officer Port was assigned to the gang intelligence unit and was familiar with the Lil Watts gang, a violent street gang from Hawthorne. He testified that Lil Watts gang members primarily committed narcotics offenses involving possession and sales, vandalism, and gun-related crimes, including assaults with firearms and semiautomatic firearms, driveby shootings, and homicides. The police had identified defendants Medina and Vallejo as members of the Lil Watts gang, based on field contacts and their gang tattoos. The police considered Marron to be "affiliated" with the Lil Watts gang, having seen him with Lil Watts gang members, including Medina and Vallejo.

Officer Port testified that the Lake Los Angeles area where Ordenes lived is considered a "transient area for gangs." When a new gang member arrives there, he feels a need to establish himself by demanding respect, which is "the main pride" of a gang member. Officer Port testified that gang members view behavior that "disrespects" their gang as a challenge and a "slap in the face," which must be avenged. Gang members perceive that, if no retaliatory action is taken in the face of disrespectful behavior, the challenger and others will view the gang member and the gang itself as weak. According to Officer Port, violence is used as a response to disrespectful behavior and disagreements and as a means to gain respect.

Officer Port stated that, when a gang member asks another person, "where are you from?" he suspects that person is in a gang and wants to know what gang he claims as his. In response to hypothetical questions, Officer Port opined that when Barba responded "Sanfer," he was claiming membership in that gang, and that the Lil Watts gang members had viewed Barba's response as disrespectful and had started a fight to avenge themselves. Officer Port stated that a gang member who asks that question could be armed and probably would be prepared to use violence, ranging from a fistfight to homicide. He explained, "In the gang world problems or disagreements aren't handled like you and I would handle a disagreement. . . . When gangs have a disagreement, you can almost guarantee it's going to result in some form of violence, whether that be punching and kicking or ultimately having somebody shot and killed."

Ordenes testified that it is important for a gang to be respected and, above all, feared by other gangs. Once a gang is no longer feared, its members lose respect, are ridiculed, and become vulnerable and subject to attack by other gangs. He stated that death is sometimes an "option" exercised by gang

members as a way to maintain respect. Ordenes further stated there are a lot of gang members occupying their "turfs" with guns.

The jury acquitted codefendant Falcon, but found defendants Medina, Marron, and Vallejo guilty as charged, and found true various enhancement allegations, including that the crimes were committed for the benefit of a gang. (§ 186.22, subd. (b)(1).)

The Court of Appeal affirmed Medina's conviction, but reversed the convictions of Marron and Vallejo on the ground there was insufficient evidence that the nontarget crimes of murder and attempted murder were a reasonably foreseeable consequence of simple assault, the target offense they had aided and abetted.

We granted the Attorney General's petition for review regarding the reversals of Marron's and Vallejo's judgments.

## II. DISCUSSION

The Attorney General argues that, when the facts are viewed as a whole, there is substantial evidence to support the murder and attempted murder convictions of defendants Marron and Vallejo. We agree.

Substantial evidence is evidence that is " 'reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) "In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119].) We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261 [48 Cal.Rptr.2d 135, 906 P.2d 1290].)

It is undisputed that Marron and Vallejo knowingly and intentionally participated in the fistfight that preceded the shooting, that Medina alone shot

the victim, and that the jury convicted Marron and Vallejo of murder and attempted murder as aiders and abettors under the natural and probable consequences doctrine.

■ "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People* v. *Prettyman* [(1996)] 14 Cal.4th [248,] 260–262 [58 Cal.Rptr.2d 827, 926 P.2d 1013].)" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133 [77 Cal.Rptr.2d 428, 959 P.2d 735].) Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 535 [26 Cal.Rptr.2d 323].)

"[A]lthough variations in phrasing are found in decisions addressing the doctrine—'probable and natural,' 'natural and reasonable,' and 'reasonably foreseeable'—the ultimate factual question is one of foreseeability." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Thus, " '[a] natural and probable consequence is a foreseeable consequence'. . . ." (*Ibid.*) But "to be reasonably foreseeable '[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . .' (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) § 132, p. 150.)" (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 535.) A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case (*ibid.*) and is a factual issue to be resolved by the jury. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [37 Cal.Rptr.2d 596]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499 [3 Cal.Rptr.2d 325].)

Here, the Court of Appeal held there was insufficient evidence to support a finding that Medina's act of firing a gun was a reasonably foreseeable consequence of the gang attack in which defendants Marron and Vallejo participated. In so holding, the Court of Appeal reviewed gang violence cases affirming defendants' liability as aiders and abettors. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 10–11 [104 Cal.Rptr.2d 247] [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 [88 Cal.Rptr.2d 482] [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Olguin, supra*, 31 Cal.App.4th at p. 1376 [defendant's punching of

victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Godinez, supra,* 2 Cal.App.4th 492, 499–500 [fatal stabbing of rival gang member either during or after fistfight was natural and probable consequence of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [158 Cal.Rptr. 47] [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members].)

In evaluating those cases, the Court of Appeal distilled six factors it considered material to their holdings: "(1) the defendant had knowledge of the weapon that was used before or during his involvement in the target crime; (2) the committed crime took place while the target crime was being perpetrated; (3) weapons were introduced to the target crime shortly after it ensued; (4) the fight which led to the committed crime was planned; (5) the gangs were engaged in an ongoing rivalry involving past acts of violence; or (6) the defendant agreed to or aided the commission of the committed crime." The Court of Appeal observed that, in each of the cases reviewed, more than one of the above factors was present.

■     In evaluating this case, the Court of Appeal found it significant that none of the above factors were present, focusing on facts that were *missing,* rather than on the actual evidence presented. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [82 Cal.Rptr.2d 413, 971 P.2d 618] [rather than focus on the evidence that actually existed, the Court of Appeal "focused on what it found *lacking* in the prosecution's case"].) However, as the Attorney General points out, prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor. (*People v. Montes, supra,* 74 Cal.App.4th at p. 1056 ["[g]iven the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] specifically knew [fellow gang member] had a gun"]; *People v. Godinez, supra,* 2 Cal.App.4th at p. 501, fn. 5 ["although evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite"]; *People v. Montano, supra,* 96 Cal.App.3d at p. 227 [defendant's liability for aiding and abetting attempted murder not dependent on awareness that fellow gang members possessed deadly weapons].) Likewise, prior gang rivalry, while reflecting motive, is not necessary for a court to uphold a gang member's murder conviction under an aiding and abetting theory. (See *People v. Olguin, supra,* 31 Cal.App.4th at pp. 1382–1383 [gang enhancement upheld even though no evidence of "prior relationship between the killers and their victim, and no reason for animosity other than gang-related insults"].) Thus, although evidence of the existence of the above listed factors may constitute sufficient evidence to support an aider and abettor's murder conviction under the natural and probable consequence theory, these factors are not necessary to support such a conviction. (Cf.

*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159] [guidelines in *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942] regarding premeditated murder "are descriptive, not normative"].) We do not view the existence of those factors as an exhaustive list that would exclude all other types and combinations of evidence that could support a jury's finding of a foreseeable consequence. (Cf. *Perez, supra*, 2 Cal.4th at p. 1125.) In other words, the absence of these factors alone is not dispositive.

In examining the whole record in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the shooting of the victim was a reasonably foreseeable consequence of the gang assault in this case. Medina, Marron, and Vallejo, members of the Lil Watts gang, repeatedly challenged Barba by asking, "Where are you from?" When Barba responded, "Sanfer," Vallejo declared he was a member of another gang, "Lil Watts." Medina remarked, "What fool, you think you crazy?" Apparently viewing Barba's response as disrespectful behavior, Medina, Marron, and Vallejo then attacked Barba.

The Court of Appeal emphasized there was no evidence that the assailants used weapons or were armed during the fistfight, or that the two gangs involved were in the midst of a "war" or had been involved in prior altercations. It further stressed that the shooting occurred after the fistfight had ended. However, the Court of Appeal's analysis ignores the testimony of the gang expert, Officer Port, and of Ordenes, and other evidence.

According to Ordenes, a gang member's query "where are you from?" means "what gang are you from?" and is a verbal challenge, which (depending on the response) could lead to a physical altercation and even death. Officer Port affirmed that a gang member who asks, "where are you from?" could be armed and probably would be prepared to respond with violence, ranging from a fistfight to homicide. As a former gang member, Ordenes foresaw precisely that result. He feared that somebody might get killed after Vallejo verbally challenged Barba, and, because of that fear, ordered defendants to "take that into the streets."

Once the fight ensued, the three men could not get Barba down. Despite being attacked and outnumbered by three aggressors, Barba defended himself well and held his own. Ordenes interrupted the fistfight while Barba was performing well and before the three attackers could vindicate themselves. Given the gang-related purpose of the initial assault and the fact that, despite being outnumbered, Barba exhibited strength against three aggressors who could not avenge themselves in response to what they considered disrespectful behavior by Barba, the jury could reasonably have found that a person in

defendants' position (i.e., a gang member) would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as Barba was retreating from the scene. (See, e.g., *People v. Olguin, supra*, 31 Cal.App.4th at p. 1376.)

The record supports that implicit finding by the jury. First, according to the testimony, gang members emphasize the need for respect, primarily in the form of fear. Officer Port testified that gang members view behavior that disrespects their gang as a challenge and "slap in the face" which must be avenged. Gang members perceive that, if no retaliatory action is taken in the face of disrespectful behavior, the challenger and other people will view the gang member and the gang itself as weak. Ordenes, a former gang member, confirmed that once a gang is no longer feared, its members lose respect, are ridiculed, and become vulnerable and subject to attack by other gangs. According to Officer Port, violence is used as a response to disrespectful behavior and disagreements, and as a means to gain respect. Ordenes confirmed that gang members consider death as a means to maintain respect in some circumstances.

Second, the record reveals that Lil Watts was a violent street gang whose members regularly committed gun offenses. Officer Port testified that Lil Watts members were involved "in all sorts of gun charges," including assaults with firearms, semiautomatic firearms, driveby shootings, and homicides. Ordenes stated that many gang members occupied their turf with guns. Regarding this specific incident, Ordenes ordered the Lil Watts gang members outside because he was concerned that somebody would be killed. Thus, because Lil Watts members had challenged a rival gang member, the jury could reasonably have inferred that, in backing up that challenge, a Lil Watts member either would have been armed or would have or should have known a fellow gang member was or might be armed.

Third, although there was no evidence the two gangs involved had an ongoing rivalry, Officer Port stated that the Lake Los Angeles area is considered a "transient area for gangs" where newly arrived gang members demand respect to establish themselves in that territory. Ordenes testified that members of Lil Watts, Sanfer, and Pacoima (another gang) live in the Lake Los Angeles area. Thus, escalating the violence with a gun was a foreseeable way for a Lil Watts gang member to exact revenge for Barba's initial disrespect and his later show of strength against the three aggressors, thereby establishing Lil Watts's turf domination in the neighborhood.

Fourth, although Vallejo argues that the fistfight and shooting were not one uninterrupted event, but rather two separate incidents, the evidence showed that Medina, Marron, and Vallejo did not consider the fight to be over and

that the shooting resulted directly from that fight. Eyewitnesses testified that the events happened very quickly, in a matter of seconds, not minutes. After Ordenes had broken up the fight, someone yelled, "get the heat," just before the shooting. The Court of Appeal commented that this was "[t]he only piece of evidence that might support an inference that someone other than Medina knew the shooting would take place." But it reasoned that the evidence was "speculative" since there was no indication of who said, "get the heat," and the statement was made after the fistfight ended.

The Court of Appeal's reasoning is flawed for two reasons. First, in the gang context, it was not necessary for there to have been a prior discussion of or agreement to a shooting, or for a gang member to have known a fellow gang member was in fact armed. (*People v. Montes, supra,* 74 Cal.App.4th at p. 1056.) Second, the Court of Appeal incorrectly concluded there was no indication of who said, "get the heat" and ignored the causal relationship between the fistfight and the order to "get the heat."

Although there was no direct evidence of who specifically ordered, "get the heat," there was circumstantial evidence regarding the identity of the declarant. That evidence revealed that one of the gang participants actually knew that at least one fellow gang member had a gun. It was unlikely that Medina yelled "get the heat" to himself. Other evidence established that Rodriguez, like her husband, ordered the men to take their dispute outside because she was concerned for her children; Rodriguez yelled for the men to stop fighting; Ordenes successfully broke up the fistfight; Ordenes's neighbors Kirk and Abraham remained in the house during the fight; and Ordenes's friend, Lisa, tried to stop the shooting when she yelled from the doorway, "Stop, Tiny. No, stop." That evidence reflects that the people at the party other than defendants either wanted the fighting to end or were not present during the fighting, and had no reason to want Barba shot. In addition, Medina, Marron, Vallejo, and Falcon fled before the police arrived. (See *People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294 [72 Cal.Rptr.2d 143] [factors suggesting aiding and abetting include "presence at the scene . . . , companionship, and conduct before and after the crime, including flight"].) The jury could reasonably have concluded that one of the Lil Watts members yelled, "get the heat," and that either Medina was asking his companions for a gun, or a companion was telling him to get out a gun.[2] The fact that at least two of the gang members knew a gun was available at the scene is further evidence that gun violence was foreseeable.

---

[2] The dissent argues that it was equally reasonable for the jury to have concluded that Medina himself shouted for a gun, his companions did not know what he was talking about, and when no one responded, he retrieved the gun himself. (Dis. opn., *post,* at p. 930.) Nevertheless, the dissent does not dispute that, in view of all the evidence presented at trial,

Thus, the evidence shows there was a close connection between the failed assault against Barba (in which Marron, Vallejo, and Medina directly participated) and the murder of Barba (*People v. Prettyman, supra*, 14 Cal.4th at p. 269); Medina shot Barba because he disrespected Lil Watts (*People v. Olguin, supra*, 31 Cal.App.4th at p. 1383); and the shooting and death were " 'not an unreasonable result to be expected from the [assault].' " (*People v. Martinez* (1966) 239 Cal.App.2d 161, 178–179 [48 Cal.Rptr. 521] [conspirators liable for killing by coconspirator that went outside of express objective of conspiracy to disturb the peace; killing was reasonable result to be expected from contemplated acts].)

Finally, the Court of Appeal unduly emphasized the differences between this case and other gang cases while ignoring the similarities. As in this case, in *People v. Olguin, supra*, 31 Cal.App.4th 1355, a confrontation between three members of a gang and the victim—who they felt had shown them disrespect—escalated from mere shouting and a punch, to the shooting of the victim. Initially, the three gang members believed that the victim (possibly a member of a defunct gang) had defaced their gang graffiti, and they interpreted the defacement as a sign of disrespect and a challenge to their territorial claim. The confrontation began with the three gang members and the victim shouting at each other. Mora, one of the three gang members, then punched the victim, who was drunk, and knocked him down. As other men approached the victim to give him aid, the victim stood up and began walking towards the three gang members. Olguin, a second member of the gang, pulled out a gun and fired, killing the victim with a single shot to the chest. Despite the fact there was no evidence of a prior relationship between the defendants and their victim and no reason for animosity other than gang-related insults, the court found the shooting was a foreseeable consequence of the punch and found Mora liable for the murder of the victim. (*Id.* at pp. 1375–1376, 1382–1383.) Noting that the victim did not appear intimidated by being outnumbered, the court concluded that "escalation of this confrontation to a deadly level was much closer to inevitable than it was to unforeseeable . . . ." (*Id.* at p. 1376.)[3]

---

the jury could have reasonably concluded that one of the Lil Watts gang members yelled, "get the heat," and that either Medina was asking for and received a gun from a companion, or a companion was telling Medina to get out a gun.

"[O]ur role on appeal is a limited one." (*People v. Ochoa, supra*, 6 Cal.4th at p. 1206.) Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence. (*Ibid.*) Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1054 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

[3] Although the *Olguin* court commented that Mora knew Olguin was armed, Olguin claimed at trial that he did not tell Mora or the third gang member he was armed. (*People v. Olguin,*

In *People v. Montes, supra,* 74 Cal.App.4th 1050, the victim was shot as he was retreating from a fight between two rival gangs. Although the defendant struck the victim (a rival gang member) with a chain after the victim produced a knife, no guns were displayed or used during the fight. As the victim was about to drive off after the fight ended, the defendant's confederate retrieved a gun from a nearby vehicle, ran up to the victim, and shot him several times. Rejecting the defendant's argument that he did not know his confederate had a gun, the *Montes* court held that the homicide was a reasonable and natural consequence of the gang attack in which the defendant participated. It reasoned that escalating violence is a foreseeable consequence to be expected in gang confrontations. (*People v. Montes, supra,* 74 Cal.App.4th at p. 1056.)

In *People v. Montano, supra,* 96 Cal.App.3d 221, the court found the defendant guilty of attempted murder as an aider and abettor even though he had not fought with the victim. There, the defendant and a codefendant tricked a member of another gang into getting in their car by claiming to be members of the same gang. They drove the victim to a remote area where another codefendant met them. The two codefendants ordered the victim out of the car and escorted the victim to a nearby tree, while the defendant remained inside the car. The first codefendant produced a handgun and gave it to the second codefendant, who shot the victim. At the urging of the first codefendant, the second codefendant shot the victim again. Defendant argued there was insufficient evidence to support his attempted murder conviction as an aider and abettor; he contended he had only aided or encouraged a battery by suggesting the beating of the victim and had had no knowledge of his codefendant's intent to shoot the victim.

The *Montano* court rejected the argument, reasoning that "The evidence was clear that the attack upon [the victim] was an aspect of gang warfare and that he was attacked on the basis of his membership in the rival 18th Street gang. The frequency with which such gang attacks result in homicide fully justified the trial court in finding that homicide was a 'reasonable and natural consequence' to be expected in any such attack. It is, therefore, clear that [the defendant's] guilt of aiding and abetting an attempted murder does not depend upon his awareness that [either codefendant], or both of them, had deadly weapons in their possession." (*People v. Montano, supra,* 96 Cal.App.3d at p. 227.)

The dissent examines Ordenes's and Officer Port's testimony relating to the consequences of the challenge "Where are you from?" and concludes that, at most, they believed that a homicide was a possible, not probable,

---

*supra,* 31 Cal.App.4th at pp. 1366, 1376.) Despite the court's assertion, there does not appear to have been any evidence refuting Olguin's claim.

consequence of that challenge. The dissent emphasizes that Ordenes's actions in ordering the gang members out of his house and breaking up the fight further reflects that Ordenes did not foresee that the verbal challenge would *probably* result in a homicide. (Dis. opn., *post*, at pp. 930–932.)

Although the dissent (echoing the Court of Appeal) emphasizes that the shooting was not a *probable* consequence of the verbal challenge, the ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 107; *People v. Nguyen, supra*, 21 Cal.App.4th at pp. 531, 535.) The precise consequence need not have been foreseen. (Cf. *People v. Schmies* (1996) 44 Cal.App.4th 38, 50 [51 Cal.Rptr.2d 185] [proximate cause principles].) Even if Ordenes had not actually pinpointed, from the verbal challenge alone, the precise form of ensuing violence, he did foresee that the verbal confrontation by the Lil Watts gang members would likely escalate into some type of physical violence. Officer Port agreed that the challengers would be prepared to use physical violence.

Nor was it required that Vallejo and Marron "must have known Medina was armed." (Dis. opn., *post*, at p. 931, fn. 2.) The issue is "whether, under all of the circumstances presented, a reasonable person in the defendant's position would have *or should have known* that the [shooting] was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People v. Nguyen, supra*, 21 Cal.App.4th at p. 531, italics added.)

■ Contrary to the dissent's suggestion, there was more here than just verbal challenges by gang members. (Dis. opn., *post*, at p. 932.) There was evidence that Barba refused to succumb to the gang assault despite being substantially outnumbered and defendants were unable to avenge themselves because of Barba's show of strength; gang culture (in which defendants were involved) emphasizes respect, fear, and retaliatory violence in the face of disrespectful behavior; Lil Watts was a violent street gang that regularly committed gun offenses; and a Lil Watts gang member had ready access to a gun at the scene. Even if the three aggressors did not intend to shoot Barba when they verbally challenged him, or at the start of the fistfight, it was or should have been reasonably foreseeable to these gang members that the violence would escalate even further depending on Barba's response to their challenge. (See, e.g., *People v. Olguin, supra*, 31 Cal.App.4th at p. 1376 [refusal to show intimidation despite being outnumbered]; *People v. Montes, supra*, 74 Cal.App.4th at p. 1053 [victim produced a knife].) Thus, given the fact that defendants were unable to avenge themselves for the perceived multiple instances of disrespectful behavior by Barba, the jury could reasonably have found that defendants would have or should have known that

retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as Barba was retreating from the scene.

Accordingly, viewing the whole record in the light most favorable to the prosecution, we find there was sufficient evidence to support the murder and attempted murder convictions of defendants Marron and Vallejo.

## III. DISPOSITION

We reverse the judgment of the Court of Appeal relating to defendants Marron and Vallejo.

George, C. J., Baxter, J., and Corrigan, J., concurred.

**MORENO, J.,** Dissenting.—I dissent. In my view, the Court of Appeal reached the correct conclusion when it reversed the convictions of defendants George Marron and Raymond Vallejo. I agree with the Court of Appeal that insufficient evidence supported those convictions based on the theory that the shooting of Ernie Barba by defendant Jose Jesus Medina was a natural and probable consequence of the assault on Barba in which Marron and Vallejo participated. The Court of Appeal did not reach this conclusion lightly. The court applied the deferential substantial evidence standard of review to its inquiry. It also recognized the grim reality that disputes between gang members are in a different category from disputes between civilians. "As gang violence has become more prevalent and innocent bystanders have become victims of the violence in ever increasing numbers, our courts have recognized that a dispute between two neighbors and one between two gang members can lead to different consequences." Nonetheless, the Court of Appeal determined that even in the context of gang violence there was insufficient evidence to support the jury's verdict as to Vallejo and Marron.

The Court of Appeal carefully compared decisions affirming convictions of gang members based on the natural and probable consequences theory with the facts of this case in light of the reasonable forseeability requirement. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260 [58 Cal.Rptr.2d 827, 926 P.2d 1013] [natural and probable consequences doctrine "is based on the recognition that 'aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put in motion' "].) In each case it considered, the Court of Appeal observed that the evidence supporting the convictions of the nonperpetrator included one or more crucial facts that were absent from this case. "In evaluating the cited cases, several facts emerge

which support the courts' conclusions that each defendant was liable for the committed crime under the natural and probable consequences theory: (1) the defendant had knowledge of the weapon that was used before or during his involvement in the target crime; (2) the committed crime took place while the target crime was being perpetrated; (3) weapons were introduced to the target crime shortly after it ensued; (4) the fight which led to the committed crime was planned; (5) the gangs were engaged in an ongoing rivalry involving past acts of violence; or (6) the defendant agreed to or aided the commission of the committed crime. In all of these cases, more than one of these facts were present."[1]

By contrast, the court noted that there was no evidence that either Vallejo or Marron had knowledge that Medina was in possession of a gun before or during the fistfight with Barba. "Indeed," the court observed, "there was no evidence that anyone had a weapon of any kind prior to the shooting." The shooting of Barba did not occur during the assault on him by Medina, Vallejo and Marron. Rather, the testimony of the three percipient witnesses— Ordenes, Rodriguez, and Varela—was that the fight had broken up, Ordenes had walked Barba to his car and put him inside of it, and Barba had begun to drive away when Medina alone walked into the middle of the street and started firing. There was no evidence that the assault on Barba was planned by defendants, much less that it was a retaliatory act in the course of ongoing gang warfare between the "Lil Watts" and "Sanfer" gangs. In fact, the gang expert, Officer Port, testified that these gangs were not even rivals. Finally, there was no evidence that there was any prior agreement between defendants to go out looking for a "Sanfer" gang member to assault.

Contrary to the Attorney General's contention, by making this comparison, the Court of Appeal was not establishing a standard of evidence that must be met before a conviction based on the natural and probable consequences doctrine will be affirmed in the context of gang violence. Rather, the court was attempting to determine the contours of that doctrine by reference to extant case law, and, particularly, to cast some practical light on the elusive concept of foreseeability, given that "no published case to date gives a clear definition of the terms 'natural' and 'probable . . .' . . . ." (Judicial Council of

---

[1] The majority faults the Court of Appeal for "focusing on the facts that were *missing*, rather than on the actual evidence presented." (Maj. opn., *ante*, at p. 921.) I disagree with this characterization. The Court of Appeal did not give short shrift to the evidence potentially supporting the convictions—indeed, the majority feels compelled elsewhere in its opinion to contest the Court of Appeal's discussion of some of that evidence. (Maj. opn., *ante*, at pp. 922–924.) By definition, however, a finding that evidence is insufficient to support a judgment must be based on evidentiary deficiencies, and so, necessarily, a reviewing court would emphasize such deficiencies.

Cal., Crim. Jury Instns. (2008) Com. to CALCRIM No. 403, p. 173.) It was necessary for the Court of Appeal to examine precedent to determine the nature, quality and quantum of evidence found to be sufficient to sustain a conviction under that doctrine in order to determine whether the evidence was sufficient in this case.

What the Court of Appeal found was that the "only piece of evidence that might support an inference that someone other than Medina knew the shooting would take place was Varela's testimony that she heard someone say, 'Get the heat,' just prior to the sound of gunfire." To this, I would add the majority opinion's assertion—echoed by the Attorney General at argument—that both Ordenes and Port, the gang expert, testified, in effect, that a homicide is a reasonably foreseeable consequence of the challenge, "Where are you from?" I disagree with the majority's characterization of this evidence.

The majority places enormous weight on the "Get the heat" testimony and goes to some lengths to establish, circumstantially, that the person who uttered this statement must have been either Vallejo or Marron. (Maj. opn., *ante*, at p. 924.) That analysis proceeds, however, from an ipse dixit assumption: "It was unlikely that Medina yelled 'get the heat' to himself." (Maj. opn., *ante*, at p. 924.) Medina was the one person in this episode who knew there was a gun somewhere because he used it to kill the victim. It is not unlikely, therefore, that Medina yelled out, "Get the heat." But this does not necessarily imply that his codefendants must have known Medina had a gun with him. It only establishes that Medina, who was evidently quite angry that the attack on Barba had been broken up, shouted for a gun, not that anyone knew what he was talking about. It is just as reasonable to conclude that he shouted this command and, when no one responded, he got the gun himself. Indeed, this conclusion is more consistent with the testimony of Rodriguez that, after everyone scattered, Medina stepped out into the street with the gun and fired it.

The other bit of evidence on which the majority relies is testimony regarding the consequences of the challenge, "Where are you from?" The majority asserts: "According to Ordenes, a gang member's query 'where are you from?' means 'what gang are you from?' and is a verbal challenge, which (depending on the response) could lead to a physical altercation and even death. Officer Port affirmed that a gang member who asks 'where are you from?' could be armed and probably would be prepared to respond with violence, ranging from a fistfight to homicide. As a former gang member, Ordenes foresaw precisely that result. He feared that somebody might get

killed after Vallejo verbally challenged Barba and, because of that fear, ordered defendants to 'take that into the streets.' " (Maj. opn., *ante*, at p. 922.)

An examination of the reporter's transcript belies the majority's characterization of this evidence. What the transcript discloses is that both Ordenes and Port—and the former with considerable prodding from the prosecutor—were, at most, describing possible—not probable—consequences. For example, what Ordenes actually said, based on his experience as a gang member, was that the question, "Where are you from?" "would go on to a fight or whatever. [¶] [Q.] Or what? [¶] [A.] Or whatever else would happen. [¶] [Q.] What other things *could* happen from that? [¶] [A.] Well, death. [¶] [Q.] Death as by how? [¶] [A.] Whatever. Whatever you can use. [¶] [Q.] Okay. So if you have a weapon—[¶] [A.] You would use it." (Italics added.)

Thus, in my view, Ordenes's testimony describes a possible event, not a probable one, that might occur if weapons were present (but Ordenes did not testify that he knew or even suspected any of the defendants in this case were armed). The gang expert's testimony was equally attenuated. The expert testified that if the question "Where are you from?" was answered unsatisfactorily, "it's some form of misunderstanding that can go into some physical altercation. They *can* go from a fistfight to disrespecting each other . . . verbally and all the way as far [as] homicide." (Italics added.)

Like Ordenes, then, the expert did no more than describe a range of possible results from a fistfight to verbal insults and, perhaps somewhere down the line, a killing, although how far down the line was not elucidated. Moreover, when the expert was asked, "when a gang member usually asks that question to someone else, in your experience are they usually armed?" the expert replied, "They *can* be. It's my opinion that if you're going to ask that question, that you're probably prepared to be in *some form of altercation* following the answer." (Italics added.) "Some form of altercation," of course, is exactly what happened in this case—a fistfight. It does not necessarily encompass a homicide.[2]

Nor do I agree that Ordenes's testimony about his concern when he told defendants and Barba to take their dispute outside the house was because he

---

[2] The majority highlights Port's general testimony that the "Lil Watts" gang participated in crimes involving firearms, and concludes: "[B]ecause Lil Watts members had challenged a rival gang member, the jury could reasonably infer that, in backing up that challenge, a Lil Watts member either would have been armed or would have or should have known a fellow gang member was or might be armed." (Maj. opn., *ante*, at p. 923.) I disagree with the conclusion that it can be reasonably inferred from Port's testimony that, because some gang members participated on some occasions in gun-related crimes, these particular defendants must have known Medina was armed in the specific circumstances of this case—where members from two gangs, which were *not* rivals, met at a party house in neutral territory.

foresaw a probable homicide. It was the prosecutor who raised this specter: "[Q.] Okay. And when you heard somebody say, 'Where are you from,' did that start to concern you a little bit? [¶] [A.] Yes, it did. [¶] [Q.] Okay. And is that for the reasons you just stated right now, that you *knew* that somebody was going to get killed? [¶] [A.] *For the reason that I didn't want no problems to my house* and also that reason too. [¶] [Q.] Okay. So what happened after you heard the words, 'Where are you from?' [¶] [A.] I said, 'Take that into the streets, go outside, *don't disrespect the house.*' " (Italics added.)

Again, despite the prosecutor's prodding, Ordenes's testimony is not evidence that he reasonably foresaw a homicide as a consequence of the challenge. Instead, his testimony evinced a concern that he did not want a fight—a fistfight or some other physical altercation—inside his house where there were women and children. That this domestic concern, rather than fear of a probable homicide, was behind his command for the men to leave his house is reflected in his wife's testimony. Rodriguez also told the men to leave the house because, as she testified, "they were kind of getting loud, so I told—they had my front door open and it was cold, so I told them to take that outside because my kids are in back asleep, and then I closed the door."

Moreover, Ordenes's conduct after ordering the men out is not consistent with the majority's interpretation of his testimony. Had he suspected a killing was in the offing, one would think he would have done something to protect himself from getting caught in the crossfire, but he did not. Rather, he followed the men outside, broke up their fight and walked Barba to his car, telling him, " 'Just get in the car, just leave, I'll take care of it.' " These are not the acts or the words of someone who is fearful that a killing is imminent. They are the acts and words of someone who is prepared for a low-level altercation that can be smoothed over eventually once the participants have been separated. Thus, I disagree with the majority's characterization of Ordenes's testimony as reflecting a fear "that somebody might get killed after Vallejo verbally challenged Barba . . . ." (Maj. opn., *ante*, at p. 922.)

Stripped to its essence, what the majority holds is that the challenge "Where are you from?" is so provocative in the context of gang culture that any response up to and including murder is a reasonably foreseeable consequence of that utterance, so as to justify a murder conviction not only of the actual perpetrator but also of any other gang members involved in the target offense, whatever the surrounding circumstances. I cannot subscribe to such an expansive interpretation of the natural and probable consequences doctrine even in the context of gang violence, which no one doubts is a plague upon some of our state's most vulnerable communities.

I must agree with the Court of Appeal: "Notwithstanding the violence which most gang confrontations spawn, on our facts, viewed objectively, we cannot conclude that an unplanned fight between unarmed combatants in front of a residence was reasonably likely to lead to a shooting resulting in death. In essence, the Attorney General is asking us to create a new theory of liability. An aider and abettor would be responsible for any crime that was a natural and *possible* consequence of the target crime. That, we cannot do."

Neither can I.

Kennard, J., and Werdegar, J., concurred.