Filed 2/26/24

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>BRANDON MICHAEL PATTERSON,<br><br>    Defendant and Appellant. | F086065<br><br>(Fresno Super. Ct. No. F11902827)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Jonathan B. Conklin, Judge.

Kathy Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Jeffrey A. White, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant, Brandon Michael Patterson, filed a resentencing petition under Penal Code section 1172.6,[1] and the court determined he was eligible for relief. The court redesignated his murder conviction to attempted robbery and first-degree residential burglary.

We conclude the murder conviction cannot be redesignated as a first-degree residential burglary because that was not "the … underlying felony" (§ 1172.6, subd. (e)) of defendant's felony-murder conviction. Therefore, we reverse and remand for further proceedings.

**FACTS**

**I.      Facts Adduced at Defendant's Criminal Trial**

In the days before April 28, 2011, Leonard Vivian (Leonard) showed his friend Michelle Toner (Toner) a backpack full of cash and silver coins. Toner did not know how Leonard had come by the cash.

On April 28, 2011, Leonard asked his mother, Mary, to take him to rent a storage unit. Leonard did not have his identification, so Mary rented a unit for him at Derrel's Mini Storage. Mary drove Leonard to the specific unit they had rented. Leonard exited the car and took a backpack with him to the storage unit. Leonard also put a safe into the storage unit. Mary could tell Leonard was "stressed over something," but she "didn't want to know what was going on" and stayed in the car.

Later that same day, Mary drove Leonard to a Quality Inn. Mary rented a room for Leonard since he did not have identification. She came out to tell Leonard the price of a room and saw him speaking with a male and a female in a red car. Leonard paid for the room with cash.

Leonard went to the room Mary had rented. At some point, he came out of the room and spoke to his friend, Toner, who was there with her then-boyfriend, Dustin

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

Rutledge (Rutledge). Toner and Leonard began to argue about cell phones. Leonard had bought two phones – one newer than the other. Toner and Leonard argued over who would use which phone that day. One of the two phones was a blue Android cell phone. Rutledge and Toner left with the other phone.

Rutledge called Leonard and told him Toner was mad because she did not want the phone she had received. Toner and Rutledge went back to the Quality Inn to trade phones with Leonard. Rutledge went to Leonard's room and returned with the blue Android cell phone and money from Leonard to get food.

Toner returned to the Quality Inn later that night with defendant and Robert Anthony Garcia (Garcia). Their intention was to "go get money" from Leonard. Toner sent a text message or called Leonard, who told them what room he was staying in. Garcia stayed in the car while Toner and defendant went to Leonard's room. Surveillance footage from the Quality Inn depicts Toner and defendant near Leonard's room around 1:11 a.m.

Leonard did not know defendant, so Toner introduced them, and they smoked a cigarette. Leonard then gave Toner $100 so that she could buy drugs for him (Leonard). Toner and defendant got back into Garcia's car and went to buy "crystal meth." Toner, defendant, and Garcia then went to an apartment complex managed by Rutledge's grandmother. Toner did not bring the drugs back to Leonard and, in fact, did not return to Leonard's room for the rest of the night.

After Toner was "dropped … off" she "had no idea what had happened to the [blue Android] phone from that point on." However, Toner said she did not give the blue Android to either defendant.

Surveillance footage from the Quality Inn shows two men, later identified by Toner as defendant and Garcia, approaching Leonard's room at 1:41 a.m. The two men are then seen running away from the room at 1:48 a.m. Detective Villalvazo observed that the surveillance video depicts Garcia with "something wrapped on his arm."

3.

Detective Villalvazo later watched the Quality Inn's surveillance footage "until about daylight. I'm going to say between 8, 9 in the morning." Villalvazo testified that the only people anywhere near room 147 on the surveillance footage he watched were: (1) the male and female around 1:10 a.m.[2] and (2) the two males approaching, then running away between 1:40 a.m. and 1:48 a.m.

Quality Inn housekeeping staff found Leonard dead in his motel room the next day. Housekeeping informed the manager, who then went to the room, observed a person lying on the floor not moving, and called the police. Stephen Coleman, a police officer at the time, was dispatched to the Quality Inn at 1:19 p.m. When Coleman responded to the scene, he observed that the room was in "disarray" and appeared as though "somebody had gone through virtually all of the room searching or looking for something." Coleman initially thought Leonard had died of a drug overdose because there was a lighter in his hand and a methamphetamine pipe nearby. However, the coroner eventually moved Leonard's body revealing multiple gunshot wounds, including one to each side of the chest and one on the left arm.

Two small baggies containing methamphetamine were found in the room. The pipe located near Leonard's body had methamphetamine residue. No weapons were found in the room. A pair of jeans found in the room contained a card from Derrel's Mini Storage with a "space number" and a code on it.

### Detective Villalvazo's Interview with Toner

On May 4, 2011, Detective Villalvazo contacted Toner and interviewed her sometime thereafter. She had dyed her hair since April 28, 2011. She told Villalvazo that she had seen Leonard with an estimated $30,000 in a backpack sometime before he died. Villalvazo asked her whether defendant and Garcia knew Leonard had the money.

---

[2] Toner identified the female as herself and the male as Patterson.

4.

Toner replied that "everyone knew and was talking about it." At trial, Toner denied talking with defendant and Garcia about robbing Leonard.

### Derrel's Mini Storage

Law enforcement executed a search warrant at unit 2756 of a Derrel's Mini Storage and found only a small safe inside. Inside the safe was $10,700 in cash and 73 one-ounce silver coins.

### Defendant's Arrest

On May 1, 2011, defendant was arrested while traveling as the rear passenger in a vehicle. The vehicle also had two occupants in the front of the vehicle, one of whom was a woman named Melanie Heimgartner (Heimgartner). The occupants of the vehicle, including defendant, initially complied with officers' commands and put their hands up. Defendant was holding "what appeared to be a dark blue or dark gray cell phone in his right hand." Defendant then put his hands back down towards his lap and began to move around. One officer ordered defendant to put his hands back up. Defendant paused, looked at the officer over his right shoulder for a few seconds, and then put his hands back up. This time, his hands were empty.

A police officer observed a dark blue or dark gray cell phone in the "magazine pouch" on the back side of the driver's seat. Toner testified that the phone found in the vehicle looked "similar" to the one Leonard had the day before he died.

An orange cell phone was retrieved on defendant's person.

Defendant was arrested wearing the same clothing as one of the men running away from Leonard's room at 1:48 a.m. on April 29, 2011.

### Garcia

On May 17, 2011, Detective Villalvazo was informed that Garcia wanted to turn himself in.

5.

*Defendant's Jail Phone Calls*

Defendant's phone calls from jail were recorded and provided to a Detective Yee. Several were played for the jury.

On one phone call, Heimgartner told defendant that "they got that phone" and that the "po-pos … got the credit cards too." She told defendant to "[b]lame it on me[,] say it was that girl that was in the passenger's seat."

On another call with Heimgartner, defendant said, "I'm going to say I was with you."

Defendant also had the following exchange with Heimgartner:

"B.P.: (UNINTELLIGIBLE) see the only thing that can really, really, really f[* *]k me, is the video surveillance. Right?

"M.H.: Yeah. 'Cause [Rutledge] said it's pointed right at that room.

"B.P.: Who said that, [Rutledge]?

"M.H.: Uh-huh. I bet you probably think you're cooler than me.

"B.P.: I was wearing the same hat, same jacket that night."

On a different call, defendant had the following exchange with Heimgartner:

"B.P.: All they gotta do is pull – pull off the camera. Uh, the camera matches what I was wearing dude.

"M.H.: I love you.

"B.P.: You hear me, babe?

"M.H.: What? I'm sorry what did you say babe?

"B.P.: What's on the camera matches what I was wearing tonight.

"M.H.: Shut up.

"B.P.: It's a wrap.

"M.H.: Be quiet already, baby. Okay, just be quiet."

Later, on the same call, defendant said, "I need an alibi."

6.

Defendant told someone named Chris that he "need[ed] to find that phone," and that the "phone will get me f[* *]king a lot of time." Later, referring to a phone, defendant said, "[T]hat shit is [going to] get someone a lot of time … like f[* *]king life homey."

Defendant also asked Heimgartner on a call: "How the f[* *]k do they know that was me?"

On a call with someone referred to as "Youngster," defendant said, "There was no robbery. There was nothing taken."

### *Jury Instructions*

The only theory of murder presented to the jury was felony murder, with the alleged underlying felony being attempted robbery. Specifically, the court instructed the jury:

> "The defendants are charged with murder under a theory of felony murder. To prove that a defendant is guilty of first-degree murder under this theory the People must prove that one, the … defendant attempted to commit robbery; two, the defendant intended to commit robbery; and three, while attempting to commit robbery, the defendant caused the death of another person. A person maybe guilty of felony murder even if the killing was unintentional, accidental or negligent.

> To decide whether a defendant attempted to commit robbery please refer to the separate instructions that I will give you on that crime. You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder. The defendant must have intended to commit the robbery before or at the time that he caused the death."

Later, the court instructed the jury that "[t]he defendant must have intended to commit or intended to aid and abet the crime of robbery before or at the time that the perpetrator caused the death." The court then instructed the jury on the elements of robbery.

7.

*Verdict and Appeal*

The jury convicted defendant of first-degree murder and the court sentenced him to 25 years to life in prison. In an opinion filed December 8, 2015, this court affirmed the judgment against defendant. (*People v. Patterson* (Dec. 8, 2015, F067972) [nonpub. opn.].)

## II.     Petition for Resentencing

On June 8, 2021, defendant petitioned to be resentenced pursuant to what was then section 1170.95. The prosecution opposed the petition on the grounds that defendant was a major participant who acted with reckless indifference to human life.

The court determined defendant's petition had made a sufficient prima facie showing under then section 1170.95, subdivision (c), and an evidentiary hearing was held on March 6, 2023.

The prosecution introduced the trial transcript and trial exhibits into evidence and then rested. The court said it had the opinion in *People v. Patterson*, *supra*, F067972, but that it would not rely on the factual summaries in the opinion.

The defense had defendant's aunt testify regarding his upbringing and a psychologist testify about how adverse events in his childhood affected defendant.

After the close of evidence and argument from counsel, the court ruled that "there is insufficient evidence to find beyond a reasonable doubt that the defendant would have, in fact, be [*sic*] guilty of felony murder as a major participant in the underlying felony who acted with reckless indifference to human life."

The court then said, "So with that, I believe we now need to set it for a sentencing hearing for the court to consider what facts – what evidence – what crime the evidence did establish beyond a reasonable doubt. And I want to give the parties time to address that." The court said it wanted to give counsel "some time, if you feel necessary, unless you can address it today – if you feel necessary what other offenses would be established

8.

beyond a reasonable doubt?" The prosecutor responded, "Well, I think certainly looking at – there was only one charge." The prosecutor explained,

> "And so under (e) it says the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief and murder was charged generically. The only reason I would – part of me wants to say let's just set it and sentence him on attempted robbery today. I think – the only hesitation I have to that is I think there might be an argument. [¶] And I want to maybe just think about it, bounce this off colleagues and research."

The court invited counsel to confer over the lunch hour to see if they could come to an agreement. After a break, it was clear the parties had not come to an agreement. The court "trailed" the matter to March 9, 2023.

At the continued hearing, the prosecutor asked for the court to sentence defendant on residential burglary and attempted first degree robbery in concert. The prosecutor mentioned that defense counsel had, off the record, argued that sentencing him to a burglary count would violate his right to a jury trial. Defense counsel opposed the prosecution request arguing that defendant did not have an opportunity to defend himself against the burglary charge.

The court ruled that evidence showed beyond a reasonable doubt that defendant committed attempted first degree robbery and first degree burglary. The court sentenced defendant on four years for burglary, plus a stayed term of three years for the robbery.

**DISCUSSION**

I. **The Court Erred by Redesignating Defendant's Murder Conviction as a Burglary Conviction**

The present case presents an issue of statutory construction, which is subject to our de novo consideration. (*People v. Watson* (2021) 64 Cal.App.5th 474, 484.)

A. *Section 1127.26*

"In 2018, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted to 'amend the felony[-]murder rule and the natural and probable consequences

9.

doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.]  It accomplished this by, among other things, amending section 189 such that murder liability is not imposed on persons convicted of felony murder unless they were the actual killer, an aider and abettor who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life."  (*People v. Wilson* (2023) 90 Cal.App.5th 903, 911.)

"Senate Bill 1437 also created former section 1170.95, which established a procedure for defendants convicted of murder under the old law to seek resentencing in the trial court if they believe they could not be convicted of that crime given the above amendment to section 189.  (Stats 2018, ch. 1015, § 4.)"  (*People v. Wilson*, *supra*, 90 Cal.App.5th at pp. 911–912.)  That resentencing procedure is now governed by section 1172.6.

Under section 1172.6, an individual convicted of murder, attempted murder, or manslaughter under the felony-murder rule, natural and probable consequences doctrine, or any other theory under which malice is imputed based on the person's participation in a crime, may petition for resentencing.  (§ 1172.6, subd. (a).)  The petitioner must show that they would not be convicted of murder or attempted murder because of the changes made to sections 188 or 189 effective January 1, 2019.  (*Id*., subd. (a)(3).)

Generally, successful petitioners under section 1172.6 are resentenced only on the counts that remain after the murder, attempted murder, or manslaughter conviction is vacated.  (§ 1172.6, subd. (d)(1).)  In some circumstances, however, the original conviction is not simply vacated, but instead redesignated as a different conviction for sentencing purposes.  Specifically, section 1172.6, subdivision (e) provides, in pertinent part:

"The petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged."

"Target offense" is a term used in connection with the natural and probable consequences doctrine, referring to the crime the defendant intended to commit. (*People v. Medina* (2009) 46 Cal.4th 913, 920, quoting *People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.) "Underlying felony" is a term often used in connection with felony murder, referring to the offense that was the basis for felony-murder liability at trial. (*People v. Watson*, *supra*, 64 Cal.App.5th at p. 485.)

Here, defendant was convicted on a felony-murder theory and not a natural and probable consequences doctrine theory. Consequently, the import of section 1172.6, subdivision (e) here is that defendant's murder conviction "shall" be redesignated to "the … underlying felony."

We think it is quite clear as a matter of plain language that section 1172.6, subdivision (e) only permits redesignation of a felony-murder conviction to the underlying felony(ies) on which the defendant's felony-murder conviction was *actually* based. First, the very definition of an "underlying" felony in this context is the felony upon which the felony-murder theory tendered to the jury was based. It does not refer to any and all felonies the defendant committed, but rather only those that "underlie" the felony-murder. Second, the use of a definite article in the phrase "*the* … underlying felony," further suggests it refers to the *specific* felony that *actually* underlied the defendant's murder conviction at trial.[3]

---

[3] While we find the phrase "the … underlying felony" pertinent, it is not because it suggests a singular – rather than multiple – underlying felonies. To the contrary, we agree with other published cases that, in some circumstances, a single murder conviction can be redesignated as multiple underlying felonies.

Instead, we find the phrase "the … underlying felony" pertinent because it conveys specificity. It shows the Legislature was not referring to any felony, but rather the specific felony that actually "underlied" the defendant's felony-murder conviction.

11.

To determine the felony(ies) on which the felony-murder conviction was actually based, the court can look to jury instructions, verdicts, and stipulations between the parties.

Under this view, it is amply clear that attempted robbery was "the … underlying felony" in defendant's case. The court instructed the jury that in order to prove defendant was guilty of felony murder, the prosecution was required to prove that he committed attempted robbery.

However, first degree burglary was not an "underlying felony" in defendant's felony-murder conviction. The court did not include burglary in its felony-murder instructions (or any other instructions for that matter). Nothing in the verdicts suggest the jury used burglary as the underlying felony for defendant's murder conviction. The only mention of burglary we found at trial actually cuts against a finding it was the underlying felony. In closing argument, the prosecutor emphasized that robbery is different from burglary, that the pertinent felony here was attempted robbery.[4] It is clear that burglary did not actually "underlie" defendant's felony-murder conviction. Because burglary was not "the … underlying felony," defendant's murder conviction cannot be redesignated as burglary under section 1172.6, subdivision (e).[5]

In this respect, the present case is different from those where the court did instruct the jury on the underlying felony later imposed by the resentencing court under section 1172.6, subdivision (e). (See *People v. Howard* (2020) 50 Cal.App.5th 727, 732 [jury was instructed on burglary; jury found true felony-murder special circumstance, finding

---

[4] The prosecutor said, "And after serving on this jury you may have the occasion to cringe whenever you hear a friend say well, my house was robbed last night. Because you'll know that's [a] misnomer in the eyes of the law. A robbery is a mugging. It's a taking in the immediate presence by force or fear. What you often hear people describe as a robbery is really a burglary. But we have an attempted robbery." !(RT 1400)!

[5] As a result, we do not address the remaining contentions of the parties, including notice and due process.

12.

defendant "was engaged in the commission of the crime of burglary"]; *People v. Silva* (2021) 72 Cal.App.5th 505, 512 [jury instructed on robbery].)  While there may be flexibility for a court to choose what degree or variety of the redesignated offense should be imposed when the original jury instructions/verdict only have a generic reference to the offense, that flexibility does not extend to selecting an entirely different felony that did not actually "underlie" the felony-murder conviction.

The Attorney General offers a different approach, positing that the superior court "must be permitted to impose sentences on any conviction that is supported by the evidence."  However, such a rule would contravene the plain language of section 1172.6, subdivision (e).  By its very definition, an "underlying felony" must *underlie* a felony-murder conviction.  Felony convictions that were supported by substantial evidence but were not the basis of the murder conviction simply are not "underlying" felonies in any reasonable sense of the word.  We therefore reject the Attorney General's interpretation.

## DISPOSITION

The court's order redesignating defendant's murder conviction as a first-degree residential burglary conviction is reversed.  The matter is remanded for the court to sentence defendant on the redesignated attempted robbery conviction.


POOCHIGIAN, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.


13.