Filed 8/26/14  P. v. Buendia CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064348 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD245795) |
| DAVID AMIR BUENDIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth, Judge.  Affirmed.

David K. Rankin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted David Amir Buendia of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count 1) and assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count 2). The jury also found true gang benefit enhancement allegations (Pen. Code, § 186.22, subd. (b)(1)). The trial court sentenced him to eight years in prison, then suspended execution of the sentence and placed him on three years of formal probation, conditioned in part upon him waiving his presentence custody credits and serving 365 days in jail.

Buendia appeals, contending there was insufficient evidence to convict him of count 1. We disagree and affirm the judgment.

BACKGROUND

After an evening out, the victim and two friends went to a taco stand for a bite to eat. They drove there in the victim's car, which the victim's younger brother sometimes uses. The victim ordered his food and sat down with his friends at a nearby table. Buendia and two male companions walked by talking angrily. They circled the victim's car, pointed at it, and then glared and cussed at the victim and his friends. The victim had never seen Buendia or his companions before.

One of the victim's friends tried to defuse the situation by initiating a conversation with one of Buendia's companions. The conversation ended abruptly with one of Buendia's companions repeatedly remarking, "F—k all you three."

The victim ignored the remarks, picked up his order, and started to eat his food. Around then, Buendia asked about the victim's younger brother and, in a confrontational

2

manner, told the victim to let his younger brother know Buendia[1] was looking for him. The victim got up, walked toward Buendia, and asked why Buendia was looking for his younger brother.  Buendia said the victim's younger brother tried to jump someone close to Buendia.  Although the victim tried to explain his younger brother would never fight that way, Buendia continued to insist the victim tell his younger brother Buendia was looking for him and was "going to find him . . . [and] get him."

At some point during this exchange, Buendia and his companions circled the victim, charged him and started throwing punches at him.  One of Buendia's companions lunged at the victim with a weapon.  The victim quickly took off his jacket and backed away from the men while holding his arms in a defensive position.  One of Buendia's companions got close to the victim to throw a few more punches, which the victim blocked.  The victim grabbed the man's shirt and pushed him toward Buendia, while continuing to back away.  Around then, the victim's older brother happened by and stopped the fight.  Although the victim did not realize it at the time, he was stabbed four times during the altercation:  once on his forearm, once on his triceps, once around his left ribcage, and once in the back.

Someone called 911 and when police officers responded to the scene, Buendia and his companions "tried to act casual, like nothing was happening."  The man who lunged at the victim with the weapon quickly discarded the weapon in some bushes.  A police officer later recovered an awl from the bushes.

_____

[1]     Buendia referred to himself by a moniker.  The victim thought Buendia referred to himself as "Toad," but later learned Buendia referred to himself as "Toker."

3

A gang detective interviewed Buendia after the attack. During the interview, Buendia denied being a member, but admitted being an affiliate of the Tiny Locos subset of the Linda Vista 13 street gang (gang). However, Buendia had previously claimed to be a gang member and had been documented as a gang member since 2010. His companions were also documented gang members.

After hearing hypothetical questions mirroring the facts of this case, the detective, who was also a gang expert, opined the assault was done in association with and for the benefit of a the gang. The detective also opined the assailants were promoting, furthering, or assisting criminal conduct by gang members. In addition, the detective opined the two assailants who were not armed would have known the third assailant was armed because, when gang members are together as a group, one or more of them will be armed and the others will want to know who is armed so they know who will be able to help them if they are losing a fight. Nonetheless, the detective acknowledged one gang member might not always know whether another gang member was armed. The detective further acknowledged he was not testifying Buendia actually knew one of his companion's was armed.

DISCUSSION

As to count 1, the People prosecuted Buendia under two separate theories of accomplice liability: (1) Buendia aided and abetted the commission of an assault with a deadly weapon; and (2) Buendia aided and abetted the commission of a simple assault the natural and probable consequences of which was the commission of an assault with a

4

deadly weapon.  Buendia contends there was insufficient evidence to convict him under either theory.

In evaluating a sufficiency of the evidence claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]" [Citation.]  A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

We begin our analysis with the sufficiency of the evidence to support a conviction under the second theory, the natural and probable consequences doctrine.  "The natural and probable consequences doctrine is based on the recognition that those who aid and abet should be responsible for the harm they have naturally, probably, and foreseeably

5

put in motion." (*People v. Avila* (2006) 38 Cal.4th 491, 567.) Under the doctrine, " '[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.) " '[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough." ' " (*Ibid*.)

Here, the evidence viewed most favorably to the judgment showed Buendia instigated and actively participated in a group assault on the victim. The evidence also showed Buendia and his companions were gang members and that, when gang members are together in a group, one or more of them will typically carry a weapon to ensure the group will not be disadvantaged should they become embroiled in a physical altercation. Under such circumstances, a reasonable person in Buendia's position would have or should have known the commission of an assault with a deadly weapon was a reasonably foreseeable consequence of the commission of the assault Buendia aided and abetted. As the applicable test is an objective one rather than a subjective one, whether Buendia actually knew the perpetrator had a weapon is immaterial. (*People v. Montes* (1999) 74

6

Cal.App.4th 1050, 1056.)  Accordingly, we conclude Buendia has not established there was insufficient evidence to support his conviction under the second theory.  Given this conclusion, we need not decide whether there was sufficient evidence to support his conviction under the first theory.

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.

7