Filed 9/11/14  P. v. Sanchez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FREDDIE SANCHEZ et al.,<br><br>    Defendant and Appellant. | B246346<br><br>(Los Angeles County<br>Super. Ct. No. BA367914)<br><br>**ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT)** |

THE COURT:

It is ordered that the opinion filed September 3, 2014 and not certified for publication, be modified as follows:

1.  On the title page, counsel for plaintiff and respondent was erroneously listed as "Lawrence M. Daniels, Supervising Deputy Attorney General; and Allison H. Chung, Deputy Attorney General for Plaintiff and Respondent."

    It should read:

"Scott A. Taryle, Supervising Deputy Attorney General and Erick Kohm, Deputy Attorney General for Plaintiff and Respondent."

The foregoing does not change the judgment.

PERLUSS, P. J.,                                ZELON, J.,                     SEGAL, J. (Assigned)

Filed 9/3/14 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B246346 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA367914) |
| v. | |
| FREDDIE SANCHEZ et al., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert C. Vanderet, Judge. Freddie Sanchez's judgment is affirmed as modified; Jose Navarro's judgment is reversed and remanded for resentencing.

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant Freddie Sanchez.

Robert Bryzman, under appointment by the Court of Appeal, for Defendant and Appellant Jose Navarro.

Kamala D. Harris, Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; Lawrence M. Daniels, Supervising Deputy Attorney General; and Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Two detectives driving in an unmarked vehicle observed defendant Jose Navarro attempting to burglarize a van parked on the side of the street. After one of the detectives yelled out to Navarro, defendant Freddie Sanchez began moving toward the detectives while shouting and making hand gestures. Seconds later, a third individual, David Ariaz, began shooting at the detectives' vehicle. The officers returned fire, causing Navarro, Sanchez and Ariaz to flee. Navarro and Sanchez were subsequently arrested and charged with attempted vehicle burglary, shooting at an occupied vehicle, assault with a semiautomatic firearm and various gang enhancements.

At trial, the prosecution argued Sanchez and Ariaz had been serving as lookouts for Navarro as he attempted burglarize the van. It further asserted that, under the natural and probable consequences doctrine, Navarro and Sanchez were criminally liable for Ariaz's act of shooting. The jury found Sanchez and Navarro guilty on all counts and returned true findings on each gang enhancement allegation.

On appeal, Sanchez argues there was insufficient evidence to prove he aided and abetted Navarro in the attempted burglary. Both defendants also argue there was: (1) insufficient evidence to support their shooting offense convictions or their gang enhancements; (2) prosecutorial misconduct; (3) evidentiary error; and (4) sentencing errors. We conclude the trial court committed sentencing errors. We affirm Sanchez's judgment as modified, reverse Navarro's judgment and remand his case for resentencing.

## FACTUAL BACKGROUND

### A.     *Summary of Events Preceding Trial*

At approximately 12:45 p.m. on January 26, 2010, Huntington Park police detectives Carlos Rodriguez and Gabriel Alpizar were driving eastward on Cesar Chavez Avenue in the Boyle Heights area of Los Angeles. The detectives were dressed in plain clothes and traveling in an unmarked, dark grey sports utility vehicle (SUV). Both detectives were Hispanic and wearing black leather jackets. Rodriguez, who was driving

4

with his window down, had a shaved head. Alpizar was sitting in the front passenger seat.

As the detectives approached the intersection of Cesar Chavez and Soto Street, Alpizar motioned leftward, toward the north side of Cesar Chavez, and told Rodriguez he believed someone was trying to break into a parked van. Rodriguez turned to his left and saw a Hispanic male, later identified as defendant Jose Navarro, facing the driver side door of the van. Alpizar then yelled "hey" at Navarro through Rodriguez's open window.

Rodriguez began to slow the vehicle and saw another Hispanic male, later identified as defendant Freddie Sanchez, standing on the sidewalk behind the van. After Alpizar yelled out toward Navarro, Sanchez began approaching the detectives' vehicle while shouting and making hand gestures. A third individual, later identified as David Ariaz, ran behind Sanchez and continued eastward down Cesar Chavez in the direction of the SUV. Seconds later, Ariaz began shooting at the vehicle. Rodriguez and Alpizar returned fire, causing Ariaz to flee westward down Cesar Chavez.

Following the shooting, police investigators recovered Navarro's fingerprints from the driver side window of the van. Investigators also recovered surveillance video from two security cameras that captured partial views of the incident. The video from the first camera, which provides an eastward view of Cesar Chavez, shows the front half of a van parked on the north side of Cesar Chavez. The video shows Navarro traveling westward on a bicycle down the north side of Cesar Chavez making a right turn in front of the hood of the van, continuing onto the sidewalk, and then turning right again, heading eastward down the sidewalk. Sanchez, Ariaz and a third individual, later identified as Alvaro Jara, then appear in the image walking together in a westward direction on the north side of Cesar Chavez. Navarro, heading eastward on his bike, initially drives by the three of them, executes a u-turn and begins following behind them.

The four individuals simultaneously stop next to the parked van. Sanchez then walks eastward down Cesar Chavez and takes a position just east of the van; Ariaz walks westward on Cesar Chavez, past the van and out of view; Jara remains in place next to the van. Navarro then rides toward Jara, gets off his bicycle and hands it to Jara. With

5

Jara holding his bike and Sanchez positioned just east of the van, Navarro walks to the driver side window of the van. A dark colored SUV is seen in the background driving east on Cesar Chavez Avenue. As the SUV passes, Navarro moves away from the driver side of the parked van and walks back toward the curb of Cesar Chavez. Ariaz is then seen moving rapidly from west to east toward the area where Sanchez is positioned. The SUV appears to slow down, almost to a stop. Navarro then returns to the driver side of the van, pauses briefly and then suddenly begins running westward down Cesar Chavez Avenue with Sanchez running closely behind him. As Navarro and Sanchez flee, Jara is seen first crouching down with Navarro's bike, and then wheeling the bike down Cesar Chavez in a westward direction. Moments later, Ariaz runs across the view of the camera, traveling from east to west.

The second surveillance video, which faces westward down Cesar Chavez, shows the reverse angle of these events. The video shows Navarro riding a bicycle eastward on the sidewalk of Cesar Chavez. Navarro continues riding past a van parked on the north side of the street and eventually disappears from view. As Navarro exits the picture, Sanchez, Ariaz and Jara are seen walking together westward on the sidewalk of the northern side of Cesar Chavez. As the three walk past the van, Navarro reemerges into view on his bicycle following closely behind them. All four individuals stop next to the parked van. Navarro hands his bicycle to Jara and approaches the driver side of the van. As this is occurring, Sanchez walks eastward down Cesar Chavez, past the van, and out of view of the camera. Navarro is then seen walking back toward the curb, pausing briefly and then heading back toward the driver side of the van. During this time, Ariaz is seen jogging down Cesar Chavez Avenue from west to east. About five seconds later, Navarro and Sanchez are seen running west down Cesar Chavez; after another five seconds Ariaz is also seen running west down Cesar Chavez.

Navarro and Sanchez were arrested and interrogated by Los Angeles detective James King. During his interview, Navarro informed King he had resigned from a street gang known as "Krazy Ass Mexicans" (KAM) nine months before the shooting. Navarro initially stated he was at his house when the shooting occurred. However, after detective

King produced images from the surveillance video, Navarro admitted he was on Cesar Chavez at the time of the shootings and had been trying to burglarize the parked van. Navarro explained that, shortly before initiating the attempted burglary, he had been smoking marijuana in an alley with members of a "tag crew." After leaving the alley, Navarro rode his bicycle down Cesar Chavez Avenue and saw a set of keys sitting inside a parked van. Navarro said he tried to gain access to the van because he wanted to "cruise around." While pulling down on the driver side window of the van, Navarro heard someone say something to him. Navarro then looked around, but did not see anything; shortly thereafter he heard gunshots and thought he was being fired upon by a rival gang member.

Navarro told King that Ariaz, Jara and Sanchez were not aware of his plan to burglarize the vehicle. According to Navarro, he had told Jara he was just going to "get his keys," at which point Ariaz and Sanchez repeatedly said to Jara "let's go." After further questioning from Detective King, however, Navarro admitted he had handed his bike to Jara and then asked Sanchez and Ariaz to "watch out for the cops." Navarro also agreed that, based on the surveillance video tapes, it appeared Sanchez, Java and Aria were "posting up" for Navarro, meaning that they were serving as lookouts. Navarro also agreed that when committing a crime, it was helpful to have gang members watching out for police or other gang members.

Sanchez told King he had been a member of KAM since 2005 or 2006. Sanchez stated that Cesar Chavez Avenue bordered several gang territories and that members of KAM normally stayed on the northern side of the street. Like Navarro, Sanchez initially denied being on Cesar Chavez on the day of the shooting. However, after being presented with images from the surveillance camera, he admitted he was present when the shootings occurred. Sanchez maintained, however, that he did not fire a weapon during the incident and had been forced to run for his life.

When asked to describe the events that preceded the shooting, Sanchez stated that a grey SUV had driven up and the passenger started "talking shit." Sanchez alleged the driver then pulled out his gun, causing Sanchez to flee. Sanchez denied that he was

7

acting as a lookout for Navarro and denied having anything to do with breaking into the van or shooting at the officers. Sanchez also denied having any knowledge of who ran past him immediately before the shooting began. He later admitted, however, that he saw his friend "Bouncer"—Ariaz's KAM moniker—running past him, but was unsure whether Ariaz was involved in the shooting.

On June 4, 2012, the Los Angeles County District Attorney filed an amended information charging Navarro and Sanchez with one count of attempted burglary of a vehicle (Penal Code, § 459),[1] one count of shooting at an occupied motor vehicle (§ 246) and two counts of assault with a semi-automatic firearm (§ 245, subd. (b).) The information also alleged a section 186.22 gang enhancement on each count, a section 12022 firearm enhancement on count six (attempted burglary of a vehicle) and further alleged Navarro had suffered six prior prison convictions under section 667.5.[2] Navarro and Sanchez pleaded not guilty on all counts.

### B. Trial

During opening statement, the prosecution argued that the evidence would show Navarro had attempted to burglarize the van parked along Cesar Chavez Avenue and that Sanchez, acting in conjunction with Jara and Ariaz, had aided and abetted the burglary attempt by serving as a lookout. The prosecution further asserted that the evidence would show Sanchez and Navarro were criminally liable for Ariaz's act of shooting at detectives Rodriguez and Alpizar because such conduct was a reasonably foreseeable consequence of the attempted burglary.

---

[1] Unless otherwise noted, all further statutory citations are to the Penal Code.

[2] The information originally included two additional counts for attempted murder and several additional firearm enhancements. At the request of the prosecution, however, those counts and enhancements were struck from the information prior to trial. The original information also named Ariaz and Jara as defendants. Ariaz was tried separately and convicted of attempted murder and various additional offenses.

8

### 1. Testimony of detectives Rodriguez and Alpizar

Detective Rodriguez testified that, while driving down Cesar Chavez Avenue in an unmarked police SUV, Alpizar saw an individual attempting to burglarize a van. Rodriguez then slowed the vehicle, looked over his left shoulder and saw Navarro at the driver side door or the van. As Rodriguez continued forward in the SUV, he saw Sanchez positioned just east of the van yelling toward the detectives and making hand gestures. Rodriguez stated that, based on his experience as a police officer, he believed Sanchez was making gang signs with his hands in an attempt to convey his gang affiliation. Rodriguez then saw Ariaz run eastward past Sanchez and assume a shooting position. Immediately thereafter, Rodriguez heard bullets striking the SUV. He stopped the vehicle and returned fire.

Rodriguez estimated that only 8 to 12 seconds passed between the moment Alpizar pointed toward Navarro and the moment Ariaz started shooting. Rodriguez stated that although he had intended to identify himself as a police officer, the shooting began before he was able to do so. Rodriguez also asserted that he did not have time to switch on police lights and sirens concealed within the SUV.

On cross-examination, Rodriguez admitted he was surprised when Alpizar yelled "hey" at Navarro, explaining, "that's not what [officers] are trained to do in that situation." He also admitted that, based on his appearance that day, an individual might reasonably mistake him for a Hispanic "gangster." He further acknowledged that drive by shootings are sometimes begin with "a car slowing down and someone initiating contact."

Detective Alpizar, who was initially called to testify by the defense, explained that the incident started when he saw Navarro engaged in an apparent burglary attempt of a van parked on Cesar Chavez Avenue. Alpizar informed Rodriguez what he believed was occurring and then yelled toward the suspect. Immediately after he yelled, Alpizar saw Sanchez begin walking toward the detectives' vehicle. Alpizar described Sanchez as "yelling" and "look[ing] angry." Alpizar believed the suspects were gang members and decided to exit the vehicle to identify himself as a police officer.

9

Alpizar drew his badge and gun as he exited the passenger side of the vehicle, which was positioned between him and the suspects. Before Alpizar was able to raise his badge or get around the passenger door, he heard gun shots. Prior to hearing the gunfire, Alpizar was holding his weapon below the hood level of the SUV. After hearing the shots, Alpizar raised his weapon, fired two shots in return, then crouched below the hood and moved toward the front wheel well. He was not sure whether his partner or the suspect had fired first.

Alpizar admitted that he normally would have asked his partner to cover him if he believed he was heading into a dangerous situation. He asserted, however, that he did not have any time to communicate with Rodriguez because Sanchez was advancing toward their SUV and appeared to be agitated.

### 2. *Testimony of David Ariaz*

David Ariaz testified that he had been arrested for the shooting and convicted of assault with a deadly weapon and attempted murder. Ariaz admitted that he, Navarro and Sanchez were all members of KAM. At the time of the shooting, Ariaz was living with Sanchez and another KAM member. Ariaz also admitted he knew Navarro, who lived near his mother and was known as a "smoker . . . usually looking to get high." Ariaz stated that he did not know Alvaro Jara well and was unsure whether Jara was a member of KAM. Ariaz later admitted, however, that Jara's phone number was found in his cell phone; he also admitted that, immediately after committing the shooting, he gave Jara his pistol and instructed him to "get rid of it."

Ariaz testified that, prior to the shooting, he was "patrolling" along Cesar Chavez Avenue, which he described as "guarding . . . territory" and looking for "enem[y] . . . rival gangs." Ariaz stated that he met up with Navarro, Sanchez and Jara about five minutes before the shooting. According to Ariaz, he knew Navarro intended to break into the van and decided to walk away because he did not want to be "a part of that." Ariaz further testified that he did not agree to help Navarro burglarize the van, did not agree to

10

serve as a lookout for Navarro and did not hear Sanchez or anyone else agree to serve as a lookout.

As Navarro was attempting to break into the van, Ariaz saw Sanchez start arguing with someone in an SUV. Ariaz ran toward the vehicle and saw the driver pointing a gun out the window toward him and Sanchez. Ariaz feared for his life and began shooting at the SUV, firing approximately 15 rounds.

Ariaz admitted he fired his weapon first, but asserted that he believed the driver was a rival gang member, not a police officer. Ariaz explained that the section of Cesar Chavez where the shooting occurred was a "borderline" for KAM and several of its rival gangs, including "Michigan McForce," "East LA" and "Breed." Ariaz emphasized that if a gang member was "caught slipping"—meaning caught unprepared—in this area, he could be killed by a rival gang. Ariaz also stated that it would be safer for a KAM gang member to commit an auto burglary in that area with other gang members serving as lookouts.

Ariaz testified he was "in the habit" of being armed with a firearm, explaining that members of KAM were constantly on the lookout because "nobody knows when it's going to be your time." Ariaz also stated that gang members sometimes stole vehicles to conduct gang-related activities and that it was not unusual to commit an auto burglary during the day. He further asserted, however, that gangs would normally steal vehicles at night to avoid detection. He also said he would not commit crimes with drug addicts because they are unreliable.

### 3. *Testimony of gang expert Larry Oliande*

The prosecution called Larry Oliande to testify as a gang expert. Oliande had served as a police officer in the Los Angeles area for 16 years and had been investigating KAM-related crimes since 2001. Oliande reported that KAM was a criminal street gang that had been in existence since the 1980s. Oliande had investigated numerous types of KAM-related crimes including robberies, assaults with a deadly weapon, firearm and narcotics violations, burglaries from motor vehicles and auto thefts. Oliande described

11

three recent convictions involving known KAM gang members, which included a robbery and two firearm offenses.

Oliande also testified that Freddie Sanchez and Jose Navarro had both identified themselves to him as members of KAM. Oliande also had prior contacts with Ariaz, who was a KAM member who went by the moniker "Bouncer." Oliande identified Jara as a young "associate of KAM" who was in the "lower level trying to work his way up and gain [a] reputation."

Oliande testified that there was "an abundance of gang activity" in the area where the shooting occurred, which "border[ed]" several gang territories. Oliande explained that the northern side of Cesar Chavez constituted the southern boundary of KAM's territory, while several rival gangs claimed control over the southern side of the street, including "Michigan Crime Force," "East LA" and "Breed Street."

Oliande stated that criminal street gangs such as KAM normally seek to establish a "violent reputation" that engenders fear and respect within the community. Oliande explained that gangs benefit "by having a violent reputation . . . [because] it allows the gang members to conduct criminal activity in their neighborhood" without fear of prosecution. Oliande also explained that the violent act of a single gang member can benefit the gang as a whole by demonstrating to rival gangs and the community that the gang as a whole is violent. According to Oliande, gangs were also likely attack rival gang members who come into their territory.

Oliande also explained that "interrupting a crime in progress that is being committed by a gang member" would constitute a form of disrespect that would likely result in "severe consequences." He also stated that a gang member was likely to respond in a violent manner if he saw someone try to interrupt a crime being committed by fellow gang member. When asked to explain why a gang member would behave in such a manner, Oliande stated: "A gang member or a group of gang members, they don't want to be challenged in their neighborhood while committing a crime. They want to do whatever they want to do that benefits them. . . ."

12

Oliande also stated that one way gang members communicate with other gang members and the community is through the use of "hand signs." According to Oliande, if a gang member sees a rival gang member, he may flash his gang sign through a hand gesture, which constitutes a "challenge" and a "major form of disrespect" that is likely to invoke a violent response.

Oliande further explained that KAM would benefit from using several members to commit a crime in the middle of the day, in front of numerous pedestrians. Oliande stated that such conduct would demonstrate to the community that KAM could commit crimes with impunity. Oliande also asserted that stealing property from a vehicle would benefit a gang by enhancing its reputation and providing property for the gang as a whole.

Oliande asserted it would be safer for KAM members to attempt a burglary as a group, explaining that a KAM member acting alone would face a higher risk of being detected by the police or confronted by rival gang members. Oliande theorized that having multiple gang members present would enable the direct perpetrator to focus on the actual commission of the crime, while other gang members watch "[his] sides for police and for rival gangs."

### 4. Additional witness testimony and evidence

Josefina Alvarado testified that, on the date of the shooting, she had parked her van on Cesar Chavez Avenue and gone into a barber shop to visit her brother. Alvarado stated that she did not leave the keys in her car, but had left the window down an inch. Alvarado's sister-in-law, Joanna Salazar, was working at a tattoo shop located next door to the barber shop. Approximately 20 minutes before the shooting, Salazar saw Ariaz standing near the van, looking back and forth like he was waiting for someone. Salazar also stated that the section of Cesar Chavez where the shooting occurred is a "busy area" that has "a lot of foot traffic." Salazar recalled that, on the day of the shooting, there was an "average" amount of pedestrian traffic with many people "walking back and forth."

13

Navarro's parole officer testified that Navarro had tested positive for cocaine in October of 2009 and was placed in a drug program. Perry Zimmerman, a specialist in drug addiction, testified that Navarro's statements and psychological tests indicated he was a drug addict. Zimmerman further testified that one common characteristic of drug addicts is "the need to commit crimes to support their addiction." According to Zimmerman, it is "very common to resort to crime in order to support a [drug] habit."

In addition to the live testimony, the jury was shown both of the surveillance videos that were recorded on the day of the shooting. Detective King authenticated the video, explaining that he had obtained the footage from two retail stores with security cameras located on Cesar Chavez Avenue. King also identified each of the individuals appearing on the video. The jury also heard recordings of the custodial interviews that detective King conducted of Navarro and Sanchez.

### 5. *Jury verdict and sentencing*

On June 7, 2012, the jury found Navarro and Sanchez guilty of all counts and returned true findings on each of the special enhancement allegations. Sanchez was sentenced to 16 years to life in prison; Navarro was sentenced to 22 years to life in prison.

### DISCUSSION

On appeal, Sanchez argues there was insufficient evidence to convict him of aiding and abetting the attempted auto burglary, thereby requiring reversal of his conviction on every count. Both defendants additionally assert there was insufficient evidence to support the jury's findings that: (1) the shooting offenses were a natural and probable consequence of the attempted vehicle burglary; (2) Ariaz was not acting in self-defense when he committed the shootings; and (3) the attempted burglary and shooting offenses were gang-related. Both defendants also allege evidentiary error, prosecutorial misconduct and various errors during sentencing.

14

### A. *Substantial Evidence Supports Sanchez's Conviction for Attempted Vehicle Burglary*

Sanchez argues there was insufficient evidence to support his conviction for attempted burglary of a vehicle. "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

At trial, the prosecution argued Sanchez had aided and abetted Navarro in his attempt to burglarize the van that was parked on Cesar Chavez Avenue. "Under California law, a person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator. (§ 31.)" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman* ).) "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.] (*Ibid*.; see also *People v. Chiu* (2014) 59 Cal.4th 155, 164 (*Chiu*).) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent [the crime], is sufficient to establish aiding and abetting its commission. [Citations.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) The trier of fact may, however, consider both of these "[f]actors . . . in determining 'whether one is an aider and abettor. [Other relevant factors] include . . . companionship, flight, and conduct

15

before and after the crime.' [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

Sanchez does not dispute there was sufficient evidence for the jury to find that: (1) Navarro attempted to burglarize the van, and (2) Sanchez was aware of Navarro's criminal purpose. Sanchez asserts, however, that the prosecution failed to prove the third element: that he engaged in any act that was intended to aid or encourage Navarro in committing the offense. According to Sanchez, the evidence at trial showed only that he was present when that acts occurred and that he was aware of Navarro's criminal intent. The evidence supports the jury's finding.

The prosecution's gang expert identified Sanchez, Navarro, Ariaz and Jara as members of the criminal street gang KAM. The gang expert further testified that the attempted burglary occurred on a section of Cesar Chavez Avenue that bordered the territories of several rival gangs. According to the expert, because there was a substantial amount of gang activity along this section, it would be extremely dangerous for a gang member to attempt to commit a crime in the area without the aid of other gang members serving as lookouts. Navarro and Ariaz made similar statements (Navarro during his custodial investigation and Ariaz at trial), both explaining that that it would be safer for a gang member to attempt a crime along Cesar Chavez with the aid of lookouts. The prosecution also introduced evidence that Navarro told law enforcement he had asked Sanchez and Ariaz to "watch out" for him as he attempted to burglarize the van. The images in the surveillance video suggest that Sanchez and Ariaz complied with this request. The images show Sanchez, Ariaz, Navarro and Jara traveling in close proximity to one another. The four suspects then simultaneously stop near the van. Navarro hands his bike to Jara, who remains in place; Sanchez walks to a position immediately to the east of the van and Ariaz takes a position west of the van. Navarro then approaches the driver side of the van. Immediately after the shooting occurs, all four suspects fled in the same direction.

The prosecution also introduced evidence that Sanchez confronted the detectives during the course of the burglary attempt. Detective Rodriguez testified that immediately

16

after his partner (Alpizar) yelled "hey" at Navarro—who was then attempting to burglarize the van—Sanchez started yelling angrily at the detectives and flashing what appeared to be gang signs with his hands.

Considered together, the evidence summarized above is sufficient to support the jury's finding that Sanchez aided and abetted Navarro in the attempted burglary. This evidence showed that Navarro and Sanchez were both present at the scene of the crime and that Sanchez knew Navarro was about to attempt a crime. The evidence also showed Sanchez's conduct both before and after the crime was consistent with aiding and abetting. Specifically, the evidence showed that: (1) Sanchez stopped with Navarro at the van; (2) assumed a position near the van during the commission of the offense; (3) confronted the detectives who tried to stop the burglary attempt; and (4) fled with Navarro.

### B. Defendants have failed to identify any ground that would support a reversal of their convictions for assault with a firearm and shooting at an occupied vehicle

Navarro and Sanchez were convicted of assault with a semiautomatic firearm and shooting at an occupied vehicle under a form of accomplice liability known as the "'natural and probable consequences' doctrine." (*Prettyman, supra,* 14 Cal.4th at p. 260.) Defendants contend these shooting offense convictions must be reversed because: (1) there was insufficient evidence that Ariaz's act of shooting at the detectives was a natural and probable consequence of the attempted vehicle burglary; (2) the evidence established as a matter of law that Ariaz shot at the detectives in self-defense; (3) the court committed evidentiary error by excluding the defendants' expert on police procedures; and (4) during closing argument, the prosecutor made a misstatement of law regarding the natural and probable consequences doctrine.

*1. Substantial evidence supports the jury's finding that the shooting offenses were reasonably foreseeable consequences of the attempted burglary*

*a. Summary of the natural and probable consequences doctrine*

"Under the natural and probable consequences doctrine, an aider and abettor is guilty of not only the offense he intended to facilitate or encourage [the target crime], but also of any reasonably foreseeable offense committed by the actual perpetrator [the nontarget offense]." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407-408; see also *Prettyman, supra*, 14 Cal.4th at p. 261.) "'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164.)

To establish liability under the natural and probable consequences doctrine, the prosecution must prove three elements: (1) the defendant aided and abetted the commission of the target crime; (2) "the defendant's confederate committed an offense other than the target crime"; and (3) "the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted." (*Prettyman, supra*, 14 Cal.4th at p. 262.) "Liability under the [third element] 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) The question for the jury is not whether the defendant "*actually* foresaw" the confederate's commission of the nontarget offense, but "whether, judged objectively, [the commission of the nontarget crime was] reasonably foreseeable." (*Ibid*.)

18

"'[T]o be reasonably foreseeable,' the consequence "need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . . " [Citation.]' [Citation.]" (*Medina, supra,* 46 Cal.4th at p. 920.) There must, however, "be a close connection between the target crime aided and abetted and the offense actually committed." (*Prettyman, supra*, 14 Cal.4th at p. 269.) "Murder, for instance, is not the 'natural and probable consequence' of 'trivial' activities." (*Ibid.*)

### b. *Application of the natural and probable consequences doctrine in the context of gang crimes*

In *Medina, supra*, 46 Cal.4th 913, the California Supreme Court considered whether the prosecution had provided sufficient evidence to prove the defendants were criminally liable for a murder their confederate committed during the course of a gang assault. Defendants Jose Medina, George Marron and Raymond Vallejo, who were all members of the "Lil Watts" gang, attacked a man after he identified himself as a member of a rival gang. The victim fought off the defendants, got back to his car and drove off with his girlfriend. As he was driving away, Medina then walked into the street and fired a pistol at the moving vehicle. (*Ibid.*) The victim was shot in the head and died from his injuries.

Marron and Vallejo were charged with first degree murder and attempted murder under the natural and probable consequences doctrine. (*Medina, supra*, 46 Cal.4th at p. 917.) At trial, a gang expert testified that the defendants viewed the victim's claim of membership in another gang to be disrespectful and then started a fight to avenge themselves. The expert further stated that a gang member who asks what gang another person is in could be armed and probably would be prepared to use violence, ranging from a fistfight to homicide. (*Id*. at p. 918.) The host of the party, a former gang member, testified that many gangs "occupy their 'turfs' with guns" and that "death is sometimes an 'option' exercised by gang members as a way to maintain respect." (*Id*. at pp. 918-919.) The jury convicted all three defendants of murder and attempted murder.

19

The Court of Appeal reversed the convictions of Marron and Vallejo, concluding there was insufficient evidence that the murder and attempted murder were a reasonably foreseeable consequence of the target offense they had aided and abetted. (*Medina, supra*, 46 Cal.4th at p. 919.) The court "emphasized there was no evidence that the assailants used weapons or were armed during the fistfight, or that the two gangs involved were in the midst of a 'war' or had been involved in prior altercations." (*Id.* at p. 922.)

The Supreme Court reversed, explaining that the prosecution was not required to show "prior knowledge that a fellow gang member is armed" or that two gangs had previously been involved in a rivalry. (*Medina, supra,* 46 Cal.4th at p. 922.) The Court found the jury could reasonably infer the shooting was a foreseeable consequence of the initial assault based on the following evidence: (1) the defendants had initially challenged [the victim] by asking what gang he was from; (2) the gang expert testified that gang members emphasize the need for respect and use violence as a response to disrespectful behavior, (3) the gang expert testified that Lil Watts "regularly committed gun offenses" and "occupied their turf with guns" (*id.* at p. 923); (4) the expert testified that "escalating the violence with a gun was a foreseeable way for a Lil Watts gang member to exact revenge for . . . disrespect and . . . establish[ ] . . . turf domination" (*ibid.*); and (5) the fact that one of the gang members said "get the heat" suggested that "at least two of the gang members knew a gun was available at the scene." (*Id.* at p. 925.)

Numerous other appellate decisions have affirmed jury verdicts finding "shootings to be a foreseeable consequence of gang confrontations . . . ." (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1449 [fatal shooting that occurred during gang confrontation].) As in *Medina,* those cases generally involve defendants who assisted in the commission of a battery or assault on a rival gang member that escalated to a shooting. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1053 (*Montes*) [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain];

20

*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members].)

In *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*), however, the court held that the prosecution had failed to prove that witness intimidation was a reasonably foreseeable consequence of a vehicle burglary perpetuated by two gang members. The defendant in *Leon* was breaking into a car with a gang confederate when they were confronted by the owner. After the owner announced he was going to call the police, the defendant's confederate fired a pistol into the air. The prosecution theorized that the confederate's act of shooting into the air qualified as a form of witness intimidation and that the defendant was culpable for the crime pursuant to the natural and probable consequences doctrine. A gang expert testified that both defendants were members of the same gang, that the crimes occurred in a rival gang's territory and that the gangs generally benefitted from the act of witness intimidation. (*Id*. at p. 154-155.) The jury found defendant guilty.

The appellate court reversed, explaining that the natural and probable consequences had been frequently applied in two types of cases: (1) "situations in which a defendant assisted . . . a confederate to commit an assault with a deadly weapon . . . and the confederate not only assaulted but also murdered the victim.' [Citation.]"; and (2) "situations where a defendant assisted in the commission of an armed robbery, during which a confederate assaulted or tried to kill one of the robbery victims." (*Leon, supra,* 161 Cal.App.4th at p. 160.) The court further explained that it was unaware of any case "in which a court has concluded that the crime of witness intimidation was the natural and probable consequence of either vehicle burglary . . . There is not 'a close connection' between [the burglaries defendant] aided and abetted, and [the confederate's] commission of witness intimidation. [Citation.] . . . [T]he fact that the crimes were gang related and that they were committed in a rival gang's territory clearly increased the

21

possibility that violence would occur.  However, witness intimidation cannot be deemed a natural and probable consequence of any of the target offenses." (*Id*. at p. 161.)

### c. *Substantial evidence supports the jury's findings that the shooting offenses were a foreseeable consequence of the attempted burglary*

For the purposes of their shooting offense convictions, defendants do not dispute that the prosecution established the first two elements of the natural and probable consequences, which required proof that: (1) defendants aided and abetted the attempted vehicle burglary; and (2) the defendants' confederate, Ariaz, committed the shooting offenses during the course of the burglary attempt.[3] (*Prettyman, supra*, 14 Cal.4th at p. 262.)  They argue, however, that the there was insufficient evidence to show that Ariaz's conduct—shooting at the detectives' vehicle—was a "reasonably foreseeable" consequence of the attempted vehicle burglary.  (*Ibid*.)  More specifically, they contend that the prosecutor failed to introduce substantial evidence that the "car burglary" would foreseeably "escalat[e] . . . into a violent shootout . . ."  We disagree.

"Viewed in a light most favorable to the verdict [citation], the substantial, credible evidence at trial [showed] the following" (*People v. McPeters* (1992) 2 Cal.4th 1148, 1182 [summarizing applicable standard of review] [superseded by statute on other grounds as described in *People v. Wallace* (2008) 44 Cal.4th 1032, 1086]):  (1) four KAM members perpetrated a crime in the middle of the day, on a street with substantial pedestrian traffic; (2) the crime occurred in a disputed "border" territory where gang confrontations were not uncommon; (3) defendants anticipated somebody might attempt to interfere in the crime, thereby necessitating the use of lookouts; (4) if a pedestrian or rival gang member tried to interfere with Navarro during the burglary attempt, it would be seen as a form of disrespect that would produce a violent response; and (5) Navarro and Sanchez had reason to know that Ariaz or another fellow KAM member participating

---

[3]     As discussed above, we have rejected defendant Sanchez's argument that there was insufficient evidence to support the jury's finding that he aided and abetted the attempted vehicle burglary, which would have absolved him of any criminal liability for the shooting offenses.

in the crime was likely to be armed with a firearm. A rational trier of fact could infer from this evidence that the shooting offenses were a reasonably foreseeable consequence of the attempted burglary. (See generally *People v. Loza* (2012) 207 Cal.App.4th 332, 346 ["in determining the sufficiency of the evidence to support a guilty verdict, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' [Citation.]"].)

Defendants, however, argue that this case is "distinguishable" from the Supreme Court's ruling in *Medina* because the attempted burglary was not a violent crime and "did not involve any conflict with rival gang members." There is, however, no language in *Medina* suggesting that the natural and probable consequences doctrine is limited to gang cases in which the target offense was either inherently violent or involved a conflict with another gang. Indeed, the Court emphasized there is no "exhaustive list [of factors] that would exclude . . . types and combinations of evidence that could support a jury's finding of a foreseeable consequence." (*Medina, supra,* 46 Cal.4th at p. 922.) Rather, according to the Court, whether a consequence was foreseeable "is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Id*. at p. 920.) For the reasons discussed above, under the circumstances of this particular case, the jury could reasonably find it was foreseeable that the attempted burglary might result in a shooting.

Defendants also contend that this case cannot be meaningfully distinguished from *Leon, supra,* 161 Cal.App.4th 149. *Leon*, however, is of limited precedential value because it was decided before the California Supreme Court issued its ruling in *Medina*. Moreover, the facts in *Leon* make clear that the prosecution in that case failed to introduce any evidence that witness intimidation was actually a foreseeable consequence of the defendants' vehicle burglary. According to the court, the evidence showed nothing more than that "the crimes were committed by two gang members and that the crimes were committed in a rival gang's territory." (*Id*. at p. 160.) Although the gang expert testified the gang would benefit from witness intimidation, he did not explain whether the

23

crime was a foreseeable consequence of a vehicle burglary. By contrast, in this case, there was evidence that: (1) given the location and timing of the burglary, it was foreseeable Navarro would be confronted by either a rival gang member or other intervener; (2) the defendants anticipated that someone might attempt to interfere in the crime, thereby necessitating the use of lookouts; (3) if someone did confront Navarro during the burglary attempt, it was likely that a lookout would respond in a violent manner. No such evidence was presented in *Leon*.[4]

### 2. *Substantial evidence supports the jury's finding that Ariaz did not act in self-defense*

Defendants next argue that their shooting offense convictions must be reversed because, as a matter of law, the prosecution failed to prove Ariaz was not acting in self-defense when he fired at detectives Rodriguez and Alpizar.

The jury was instructed that if the prosecution failed to prove Ariaz did "not act in lawful self-defense or defense of another" beyond a reasonable doubt, the jury was required to return a verdict of not guilty on the defendants' shooting offenses. The jury was further instructed that Ariaz acted in self-defense if: (1) he reasonably believed he or someone else was in imminent danger of bodily injury; (2) he reasonably believed the use

---

[4] We also reject Sanchez's assertion that the shooting convictions must be reversed because it was unforeseeable that a "plain clothes detective[] would drive by in an unmarked car, yell at the perpetrators, and a third person would pull out a gun and start shooting at the detectives." For the purposes of the natural and probable consequences doctrine, the prosecution was not required to prove that the exact course of events that preceded the shooting were foreseeable; instead, it was required to show only that "a reasonable person in the defendant's position would have or should have known that the [shooting] offense[s] w[ere] a reasonably foreseeable consequence of the [attempted burglary]." (*Medina, supra,* 46 Cal.4th at p. 920.)

24

of force was necessary to defend against that danger; and (3) he used no more force than was reasonably necessary to defend against the danger.[5]

"Issues arising out of self-defense, including whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself, and whether the force used was excessive, are normally questions of fact for the trier of fact to resolve." (*People v. Clark* (1982) 130 Cal.App.3d 371, 378, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) Self-defense may be found as a matter of law if "the evidence is uncontroverted and establishes all of the elements for a finding of self-defense." (*Clark, supra,* 130 Cal.App.3d at p. 379.) "[H]owever, where some of the evidence tends to show a situation in which [the use of force] may not be justified," or where "the evidence is uncontroverted but reasonable persons could differ on whether the resort to force was justified or whether the force resorted to was excessive, the self-defense issue is a question of fact for the trier of fact." (*Ibid.*)

The defendants argue they "produced evidence sufficient to raise a reasonable doubt that Ariaz acted in self-defense [because] a reasonable person in Ariaz's position would believe he was being shot at by rival gang members." In support, they cite evidence that: (1) the shooting occurred in an area that bordered numerous rival gang territories: (2) the detectives were in plain clothes and appeared to be gang members; (3) the detectives failed to identify themselves as law enforcement and engaged in conduct that was consistent with a drive by shooting; (4) Sanchez told investigators he saw a gun come out of the window of the SUV; and (5) Ariaz testified the driver pointed a pistol at him before any shots were fired.

Defendants may be correct that such evidence would be "sufficient" to support a jury finding of self-defense. However, where (as here) the jury has rejected the claim of self-defense, the relevant question is whether, viewing the evidence in the light most

---

[5] Defendants have not raised any issue regarding the content of these instructions, which properly reflects the law of self-defense. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083; CALCRIM No. 3470.)

favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the perpetrator was not acting in self defense. (See *People v. Johnson* (1980) 26 Cal.3d 557, 576 [when the sufficiency of the evidence is challenged, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]"].)

In presenting their self-defense claim, defendants have relied on isolated evidence that supports their version of what occurred and have ignored conflicting evidence. For example, the testimony of Rodriguez and Alpizar suggests that neither detective displayed or fired his weapon until after Ariaz began firing at the SUV. Viewed in the light most favorable to the prosecution, the evidence indicates the detectives did nothing more than slow down their vehicle and yell "hey" toward Navarro, which caused Sanchez to approach their vehicle in an aggressive manner. As Alpizar started to exit the vehicle to identify himself as a police officer, Ariaz began shooting. A trier of fact could rationally conclude from this evidence that Ariaz did not reasonably believe he was in imminent danger of bodily injury at the time he started shooting, or that he used more force than was reasonably necessary to defend against the danger he faced. Even if the evidence could be reconciled with a different finding on the issue of self-defense, that does not justify a conclusion that the jury's verdict was not supported by the evidence, nor does it warrant a reversal.

### 3. *The trial court's decision to exclude expert testimony on police procedures does not support reversal of the shooting offense convictions*

Defendants argue their shooting offense convictions must be reversed because the trial court excluded expert testimony on "whether or not [detectives Rodriguez and Alpizar] acted in accordance with . . . [proper] police procedures . . . . in the way they approached this crime that was occurring." Defendants assert such testimony was relevant to show that the shooting was not a natural and probable consequence of the attempted burglary, but rather the result of improper and unforeseeable police conduct.

### a. Factual Summary

During a pre-trial hearing, Sanchez's counsel informed the court he intended to call an expert on police procedures who would testify that it was improper for plain clothes detectives driving in an unmarked vehicle to intervene in a minor property crime. Counsel stated that the expert would further testify that the proper procedure under such circumstances would have been to call for backup, which may have avoided the shooting. According to counsel, the evidence was relevant to the question of "what's natural and probable," clarifying that the expert testimony would show the shooting was the result of "improper [police] procedures . . ."

The prosecution objected to the admission of the testimony, arguing that the actual cause of the shootout was irrelevant for purposes of the natural and probable consequences doctrine. Rather, the prosecution contended, the only relevant inquiry was whether a reasonable person would have foreseen that attempting to burglarize a vehicle in the manner the crime was committed here could result in a shooting offense. The prosecution further asserted that the defense would be able to present the same evidence and raise the same argument—that the shooting was the result of an unexpected act of plain clothes detectives—without the aid of the expert.

The court excluded the evidence, finding that "such testimony" would not be "relevant or helpful to the jury in this case." The court explained that the prosecution's theory of the case was that, given the defendants' status as gang members and the location of the property crime, it was "natural and probable . . . . that . . . . if they were challenged by rival gang members [during the attempted burglary], that firearms might be used. . . . And whether it was police officers or some guy in a black, . . . SUV pulls up and has engine trouble and gets out and stares at the guys. . . . I don't think whether proper police procedures were followed is particularly helpful to the jury in determining that issue." The trial court further explained: "[I]n my view, the internal police procedures on what to do when you're confronted when you're in plain clothes with a nonviolent crime by gang members that could erupt into a shooting is simply not helpful to the trier of fact in analyzing whether or not violence is a natural and probable

27

consequence of committing a crime like car theft in the rival gang member's area or in an area that is subject to dispute by rivals."

### b. The court did not err in excluding defendants' expert

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) "Relevant evidence" is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A trial court has "considerable discretion" in determining the relevance of evidence. (*People v. Williams* (2008) 43 Cal.4th 584, 634.) We review a court's ruling regarding relevancy for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.) We may not reverse for an error involving "the application of the 'ordinary rules of evidence'" unless the defendant shows "it is reasonably probable he or she would have received a more favorable result had that evidence been admitted." (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 751-752 [applying standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 to errors involving application of ordinary rules of evidence]; see also *People v. Marks* (2003) 31 Cal.4th 197, 226 ["the application of ordinary rules of evidence . . . [are reviewed] under the 'reasonable probability' standard set forth in [*Watson*]"].)

We need not decide whether the trial court erred in excluding the expert testimony because any such error would have been harmless. During cross-examination, detective Rodriguez admitted he was "surprised" when detective Alpizar confronted Navarro by yelling "hey" out the window of the unmarked SUV. Rodriguez explained that such conduct was inconsistent with "what they had been trained to do in that situation." The prosecution never presented any evidence or argument disputing this statement. Defense counsel repeatedly emphasized these points at closing argument, telling the jury: "the unusual and provocative actions of Alpizar were interventions that caused the shooting"; "[Alpizar's] actions . . . were so unusual that they could not be foreseen"; "It's extremely unusual for a policeman in plain clothes and driving an SUV [to engage in the conduct at issue here]."

28

Thus, the record shows that the prosecution's own witness admitted his partner had engaged in conduct that conflicted with proper police procedures, the prosecution never disputed this point, and the defense argued to the jury that such actions were an unforeseeable, intervening act that resulted in the shooting. Under such circumstances, there is no reasonable probability the excluded expert testimony would have had any effect on the outcome of the case. The testimony would have simply confirmed an undisputed fact that had already been testified to by a percipient witness.[6]

### 4. Defendants have failed to establish prosecutorial misconduct

Navarro argues we must reverse his shooting offense convictions because the prosecutor committed misconduct during closing argument. Specifically, Navarro challenges the prosecutor's statement to the jury that it was "irrelevant" whether the defendants knew Ariaz was armed.

### a. Summary of trial court proceedings

At closing argument, defense counsel argued the prosecution had failed to prove Ariaz's act of shooting was a foreseeable consequence of the attempted burglary because there was "absolutely no evidence" defendants knew their confederate was armed. According to defense counsel, the evidence "clearly" showed "no one knew [Ariaz] was armed but him" and that the prosecution was merely "inviting [the jury] to speculate" on what the defendants "should have known."

In rebuttal, the prosecution argued "in this situation – and this is the law – it's irrelevant whether anyone there actually knew [Ariaz] was armed. It's irrelevant." Defense counsel raised an objection for misstatement of the law, but the court overruled

---

[6] Defendants appear to contend that, in addition to constituting evidentiary error, the trial court's exclusion of the expert constituted a violation of their due process right to present a defense. Even if the court's exclusion of the expert testimony qualified as a constitutional violation, it would have been "harmless beyond a reasonable doubt" (see *Chapman v. California* (1967) 386 U.S. 18, 24 [describing federal harmless error standard]) in light of Rodriguez's undisputed admission that Alpizar's conduct contravened standard police training.

it.  The prosecution thereafter reiterated:  "As I was saying, it's irrelevant whether [Ariaz] told anyone that he had a firearm that day."

   *b.  The prosecutor's statements do not warrant reversal of the shooting convictions*

Navarro argues that the prosecutor misstated the law when he informed the jury it was "irrelevant" whether defendants knew Ariaz had a firearm.  Navarro asserts that, in fact, the jury was required to "consider all of the circumstances" when assessing the applicability of the natural and probable consequences doctrine, including whether the defendants knew Ariaz had a firearm in his possession.  (See *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 ["The determination whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant . . . . is a factual question to be resolved by the jury in light of all of the circumstances surrounding the incident"].)  Navarro argues the prosecutor's statement, combined with the trial court's overruling of defense counsel's objection, may have mislead the jury to believe it should give no consideration to whether defendants knew Ariaz was armed.

"Conduct by a prosecutor . . . violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Whalen* (2013) 56 Cal.4th 1, 52.)[7]  "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood that the jury understood or applied the complained-of comments in an improper or erroneous manner.'  [Citation.]"  (*People v. Wilson* (2005) 36 Cal.4th 309, 337 (*Wilson*).)  "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements."  (*People v. Frye* (1998) 18 Cal.4th 894, 970 disapproved on other grounds,

---

[7]    A prosecutor's conduct "'"" violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"'" [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  Navarro, however, has not argued that the prosecutor's alleged misstatement was so egregious as to amount to a denial of due process.  Accordingly, we analyze his claim under the state law standard only.

*People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "We presume the jurors treated 'the prosecutor's comments as words spoken by an advocate in an attempt to persuade' [citation]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1204.) "'A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 244.)

We agree that the prosecutor misstated the law. Although "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's . . . conviction [of a shooting crime] as an aider and abettor" (*Medina, supra*, 46 Cal.4th at p. 921), evidence of the defendants' knowledge (or lack of knowledge) was nonetheless relevant to determining the applicability of the natural and probable consequences doctrine. (See *People v. Godinez* (1992) 2 Cal.App.4th 492, 501, fn. 5 ["evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of [the nontarget crime]"].) In this case, the prosecutor's misstatement of law may have created the misimpression among jurors that they were not permitted to consider whether the defendants knew Ariaz was armed at the time of the offense.

Despite this possibility, we find no prosecutorial misconduct. First, defendant has offered no argument explaining why the prosecutor's statement—which essentially involved using the term "irrelevant" instead of "unnecessary"—rose to the level of a "deceptive or reprehensible method of argument." The prosecutor made this comment only after defense counsel had argued the jury should acquit the defendants based on the lack of any explicit evidence showing they knew Ariaz was armed. There is no suggestion in the record that the prosecutor's statements were intended to actually mislead the jury or misstate the law. Although imprecise, the comments were brief, isolated and predicated on established case law. (See *Montes, supra*, 74 Cal.App.4th at p. 1056 [in context of gang-related shooting "it is immaterial whether [defendant] specifically knew [his confederate] had a gun"].)

31

Second, even if the prosecutor's comments constituted a deceptive or reprehensible method of argument, Navarro has failed to show a "reasonable likelihood that the jury . . . applied the complained-of comments in an improper or erroneous manner.' [Citation.]" (*Wilson, supra,* 36 Cal.4th at p. 337.) Navarro contends the prosecutor's statement may have caused the jury to believe it could not consider whether defendants knew Ariaz was armed. However, the trial court specifically instructed the jury that, to convict the defendants of the shooting offenses, the prosecution was required to prove (among other things) that "under all the circumstances, a reasonable person in the defendant's position would have known that the commission of assault with a semi automatic weapon or shooting at an occupied vehicle was a natural and probable consequence of the commission of the auto burglary." The court's instructions emphasized that in deciding whether a consequence is natural and probable, the jury was required to consider "all of the circumstances established by the evidence." The jury was further informed that if any attorney made a statement as to the law that conflicted with the court's instructions, the jury was required to follow the court's instructions. Thus, the jury was repeatedly instructed it had to consider all of the circumstances of the offense and that it should ignore any statement by an attorney that conflicted with this instruction. In the absence of any showing to the contrary, we presume the jury understood and applied the instructions read to them. (*People v. Smithey* (1999) 20 Cal.4th 936, 961.)

### C. Substantial Evidence Supports the Defendants' Gang Enhancements

Navarro and Sanchez argue there was insufficient evidence to support the jury's true findings on each of the gang enhancement allegations. "Section 186.22 adds various sentencing enhancements for gang-related felonies." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613 (*Mejia*).) For purposes of the enhancements, subdivision (b) requires the prosecution to demonstrate the felony was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." "This portion of section 186.22 requires proof of only two elements: (1) that the defendant committed a

32

felony for the benefit of, at the direction of, or in association with any criminal street gang; and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. (*Ibid.*; see also *People v. Albillar* (2010) 51 Cal.4th 47, 67 (*Albillar*).)

The prosecution may satisfy the first prong by proving the crime was committed in any of the three ways set forth in the statute: "for the benefit of, at the direction of, or in association with" a criminal street gang. (See *Albillar, supra,* 51 Cal.4th at p. 67; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [prosecution need only prove the crime was committed in any one of these three ways].) The second prong of the statute requires only that the prosecution prove the defendant acted with the specific intent to promote or assist another gang member (or members) in the commission of the offense or any other criminal conduct by gang members; it does not require a showing that the defendant acted with the specific intent to promote, further, or assist the gang as a whole. (See *Albillar, supra,* 51 Cal.4th at p. 67; *Mejia, supra,* 211 Cal.App.4th at p. 613.)

### 1. *Substantial evidence supports the gang enhancement on the attempted burglary count*

The defendants argue there was insufficient evidence to support a gang enhancement on their attempted burglary conviction: "At best the evidence showed the men were gang members in gang territory and that an auto burglary was committed." We disagree.

The prosecution satisfied the first requirement of subdivision (b) by providing substantial evidence that the attempted burglary was committed "in association with" a criminal street gang. The evidence was sufficient to establish each of the following facts: (1) the burglary attempt was committed by four KAM members acting in concert (see *Morales, supra,* 112 Cal.App.4th at p. 1178-1179 ["evidence that defendant knowingly committed the charged crimes in association with two fellow gang members was sufficient to support the jury's findings on the gang enhancements . . . ."]; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1332); (2) the crime was committed within KAM

33

territory; and (3) Sanchez displayed gang signs when detectives Rodriguez and Alpizar attempted to interrupt the attempted burglary. Moreover, the gang expert testified that, when committing a crime, gang members frequently use other gang members to serve as lookouts for rival gang members and the police. Numerous witnesses, including Ariaz and Navarro, admitted it would be unsafe for a KAM member to attempt to commit a burglary in the area where the crime occurred without the help of other gang members. Based on all this evidence, a jury could reasonably find that the attempted burglary was committed "in association with" a gang.

Alternatively, the first prong was satisfied based on evidence showing that the attempted burglary was committed "for the benefit of" KAM. The prosecution's gang expert testified that a gang would benefit from having several of its members attempt to burglarize a vehicle located within its territory in the middle of the day. The expert explained such conduct would enhance the gang's reputation by demonstrating to the community that KAM could commit crimes in its territory at any time without any fear of reprisal. It would also "instill . . . fear and intimidation that . . . gang members . . . will commit these crimes and they don't care who is watching or who is involved or whose car it is." As explained by our Supreme Court, "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation . . . can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22(b)." (*Albillar, supra,* 51 Cal.4th at p. 63.) The defendants have failed to explain why the expert's testimony, considered in conjunction with evidence showing the burglary attempt was committed by multiple gang members within their territory, was insufficient to sustain a finding that the crimes were committed for the benefit of the gang. (See *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1261 [expert opinion that crime committed by multiple gang members within their territory benefitted them by instilling fear in the public sufficient to support enhancement].)

The prosecution also introduced sufficient evidence to satisfy the second prong of section 186.22, subdivision (b), which requires a showing that the crime was committed with the intent to promote, further, or assist in criminal conduct by gang members. In our

analysis above, we concluded there was substantial evidence that Sanchez aided and abetted fellow gang member Navarro in the commission of the attempted burglary. Moreover, Navarro informed detective King that he encouraged fellow gang members Sanchez and Ariaz to assist him in the commission of the attempted burglary by serving as lookouts.

2. *Substantial evidence supports the gang enhancements on the shooting offense convictions*

Defendants argue there was insufficient evidence to support a gang enhancement on the shooting offense convictions because "Ariaz testified he shot at the detectives simply because he thought he was being shot at and was acting in self defense . . . . Thus . . . [Ariaz] acted in self defense, not . . . for the benefit of the gang." This argument, which ignores a substantial majority of the evidence presented at trial, is without merit.

The prosecution satisfied the first prong of the gang enhancement statute by introducing evidence that Ariaz committed the shooting offenses both "in association with" and "for the benefit of" a criminal street gang. The jury could infer the shooting offenses were committed "in association with" a gang based on evidence that: (1) Navarro asked fellow gang members Ariaz and Sanchez to serve as lookouts while he attempted to burglarize the parked van; (2) the defendants were in gang territory at the time of the crime, and (3) Ariaz fired at the detectives after they tried to stop the burglary attempt. Based on this evidence, the jury could reasonably conclude Ariaz perpetrated the shooting offenses (for which Navarro and Sanchez were criminally liable under the natural and probable consequences doctrine) to protect a fellow gang member during the commission of a crime.

The jury could also reasonably conclude the shooting offenses were committed "for the benefit of" the gang. The prosecution's gang expert testified that a gang would benefit by retaliating violently against a member of the community or rival gang member who attempted to interfere with a gang-related crime. The gang expert explained that "gang members don't want to be challenged in their neighborhood. They want to do

35

whatever they want to do that benefits them. . . If a community member or a fellow gang member disrupts that . . . you . . . give back and keep that reputation and keep that respect going." The expert further explained that KAM would benefit from conduct that promotes a "violent" reputation: "[The gang] benefits by having violent reputation and having that respect and instilling that fear [in the community], it allows the gang members to conduct criminal activity in their neighborhood, knowing that the community won't call the police, won't be a witness to them. It shows that the rival gang members not to mess with them. Don't come into the neighborhood or there will be consequences. . . KAM will attack if you come in the neighborhood. . . . A gang will attack a rival gang member if they come into the neighborhood. That's the kind of reputation they want." A jury could conclude from this testimony that Ariaz's act of shooting would benefit the gang in several different ways, including: (1) demonstrating to the public that interfering with a KAM crime will have severe consequences; (2) promoting the gang's reputation for violence; (3) demonstrating to other gang members that they will be attacked if they come into KAM territory.

The prosecution also provided substantial evidence that the shooting offenses were committed with the intent to promote, further, or assist in criminal conduct by another gang member. As explained above, the evidence supported an inference that Ariaz fired his weapon at the detectives because he thought they were attempting to interfere with the attempted burglary. Although Ariaz claimed he fired his weapon to protect himself, the jury was not required to credit his testimony. Based on the circumstances of the crime, the jury could reasonably conclude that the shootings were actually intended to promote or assist Navarro in his burglary attempt.

### D. Undisputed Sentencing Errors

#### 1. The trial court erred in imposing previously dismissed firearm enhancements

Defendants argue that the trial court erroneously added a one-year firearm enhancement pursuant to section 12022, subdivision (a)(1) on counts three, four and five.[8] The Attorney General concedes the error and agrees the section 12022 enhancements should be stricken from these counts. Although the information originally included section 12022 enhancement allegations on counts three, four and five, the record shows the court, acting at the request of the prosecution, dismissed each of these allegations prior to trial. The record also shows these enhancements were never tried to the jury. We order that the enhancements be stricken.[9]

### 2. *The trial court failed to advise Navarro of his right to a jury trial on his prior prison term enhancements*

Navarro contends—and the Attorney General concedes—that the trial court erred in imposing six one-year prior prison term enhancements pursuant to section 667.5. subdivision (b).[10] The information alleged that Navarro had suffered six prior convictions that qualified for section 667.5 enhancements. During the trial court proceedings, defense counsel requested that the court take judicial notice of five prior felony convictions and stated that Navarro had "admitted other charges." The parties then stipulated that judicial notice was sufficient to establish the truth of the prior convictions "with no further testimony . . . at a priors trial if [Navarro] is convicted." At sentencing,

---

[8] Section 12022, subdivision (a)(1) provides for a one year additional term for any "person who is a principal in the commission of a felony or attempted felony if one or more of the principals is armed with a firearm" unless "the arming is an element of that offense."

[9] The court also imposed a section 12022 enhancement on count six (attempted vehicle burglary). The defendants, however, have not challenged the enhancement on count six, which was never dismissed and was tried to the jury.

[10] Section 667.5, subdivision (b), which applies to a person convicted of "any felony," imposes a consecutive one-year prison term for each prior separate prison term served for any felony.

the court stated it was imposing "an additional six years pursuant to Penal Code section 667(b)."

The record contains no evidence that the prior conviction enhancements were ever tried or that Navarro was ever advised of (or waived his right to) a jury on the prior prison term enhancements. There is also no evidence that he was informed of the increased sentence that might be imposed as a result of those enhancements, his right to remain silent or his right to confront any adverse witness. (See *In re Yurko* (1974) 10 Cal.3d 857, 863 ["an accused must be advised of (1) specific constitutional protections waived by an admission of the truth of an allegation of prior felony convictions, and (2) those penalties and other sanctions imposed as a consequence of a finding of the truth of the allegation"].) The Attorney General concedes that the trial court was not permitted to impose the 667.5, subdivision (b) enhancements without first advising Navarro of his constitutional rights and obtaining his waiver, or alternatively, holding a trial on the priors allegations.

The Attorney General further asserts, however, that the proper remedy under such circumstances is to strike the enhancement and "remand the matter for a trial or admission of the prison prior allegations." Navarro has not opposed this request. Where the trial court neglected to either advise the defendant of his rights regarding prior conviction allegations or to hold a trial on those allegations, the reviewing court may remand the matter for retrial. (See *People v. Miller* (2008) 164 Cal.App.4th 653, 668 [where court imposed sentence predicated on an untried prior conviction enhancement, proper remedy was to remand for retrial of enhancement and resentencing]; *Monge v. California* (1998) 524 U.S. 721, 730; [double jeopardy protections do not apply to the trial of prior conviction allegations]; *People v. Barragan* (2004) 32 Cal.4th 236, 239, 241, 243-258 [retrial of prior conviction allegation in noncapital case does not violate principles of due process, law of the case, or res judicata].) We therefore strike the section 667.5 enhancements and remand Navarro's case for retrial on the enhancements and resentencing.

### 3.  *Navarro's abstract of judgment contains erroneous information*

Navarro argues his abstract of judgment inaccurately reflects his sentence. Specifically, the abstract states that a six-year enhancement was imposed pursuant to section 186.22, subdivision (b)(4).  The trial court, however, did not impose any such enhancement; rather, it imposed an enhanced sentence of 15 years to life under section 186.22, subdivision(b)(4), and a six year enhancement pursuant to six prior conviction allegations under section 667.5, subdivision.  As discussed above, those six enhancements must be stricken.

The Attorney General concedes the "abstract of judgment contains a clerical error and fails to reflect accurately the reporter's transcript by imposing a six-year enhancement under section 186.22, subdivision (b)(4)."  On remand, Navarro's sentence may not include a six-year enhancement under section 186.22, subdivision (b)(4).

## DISPOSITION

Freddie Sanchez's judgment is affirmed, as modified by striking the Penal Code section 12022 one-year sentencing enhancements on counts three, four and five; a corrected abstract of judgment shall be issued.

Jose Navarro's judgment is reversed and the matter is remanded for resentencing.  On remand, the Attorney General may, in its discretion, seek admission or retrial of the six section 667.5 prior prison term enhancement allegations set forth in the information.

ZELON, J.

We concur:

PERLUSS, P. J.                              SEGAL, J.[*]

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.